# DEYE v. QUALITY ENGRAVING & ELECTROTYPE COMPANY et.

Common Pleas Court, Hamilton County.

No. A-99523.  Decided July 20, 1950.

John R. Gehrig, Cincinnati, for plaintiff.
Ferd Bader, Jr., Cincinnati, for defendants.

## OPINION

By SCHMIDT, J.

This is an action for an accounting for royalties which the plaintiff claims are due him from the defendants under a contract.

The action is brought against The Quality Engraving and Electrotype Company, an Ohio corporation and Charles E. Deye and Marcella S. Deye individually and as partners doing business under the firm name of Quality Engraving and Electrotype Company.

The second amended petition alleges that on or about the 2nd day of September, 1943, the plaintiff entered into an agreement with the defendants, under which the defendants agreed to pay him reasonable compensation in consideration of his granting to them the full and exclusive right to a patent obtained by him covering a process of manufacturing composite metal molds for electrotyping. The patent was granted to the plaintiff on December 30, 1947, and was formally assigned by the plaintiff to the defendant, The Quality Engraving and Electrotype Company. The invention relates to a method of assembling and uniting units of electrotype into single composite metal molds.

The second amended petition further states that after September, 1943, at or about which time the defendants had agreed with the plaintiff to compensate him for the assignment of his invention to them, the plaintiff made repeated demands upon the defendants for the fixing of the terms of his compensation, which terms were left for further determination under the original agreement. The second amended petition further states that on or about June, 1944 the defendants agreed to pay the plaintiff a royalty of ten cents per unit of electrotype assembled and united into single composite metal molds under said method invented by him upon all said units manufactured and sold by the defendants, said royalties to be payable retroactively from January 1, 1944, and thereafter.

It is asserted that the defendants paid the plaintiff such royalties from January 1, 1944 to January 31, 1946, making remittance in periodic payments based upon the number of units manufactured and sold during preceding periods, and that such royalties paid amounted to the sum of $2,037.20.

It is then alleged that since January, 1946 the defendants have failed and refused to pay any further amounts as royalties to the plaintiff, or to account to him for the number of units sold by them since January 31, 1946. It is claimed that the defendants have continued to manufacture and sell large

quantities of said units after the aforesaid date, completely ignoring the plaintiff's contractual rights to be paid compensation on such sales.

It is alleged that plaintiff is unable to state accurately the number of units manufactured and sold by the defendants since the records are in the defendants' possession and plaintiff has not had adequate access to them.

The prayer of the second amended petition is that the defendants be required to make an accounting to the plaintiff of the units manufactured and sold by them since January 31, 1946, and that judgment be awarded to the plaintiff in such sum as the court may find to be due the plaintiff as royalties under the contract, with interest from the respective accounting dates.

Separate answers have been filed by the defendant, The Quality Engraving and Electrotype Company, and by Charles E. Deye and Marcella S. Deye, partners.

In substance these answers admit the corporate existence of The Quality Engraving and Electrotype Company, admit that Charles E. Deye and Marcella S. Deye are partners doing business under the firm name of Quality Engraving and Electrotype Company, and admit that the patent referred to in plaintiff's petition was issued and was assigned to the corporation.

The answer alleges that the defendant corporation is the sole and exclusive owner of the patent, free from any interest of the plaintiff whatever; that the invention covered by the patent was not the exclusive idea of the plaintiff but was planned, studied, designed, and completed at the workshop of the defendant by other employees and officers of the defendant company, and at the entire cost of the defendant company.

It is further alleged that the invention was planned and perfected while the plaintiff served as the superintendent of the defendant company, for which work he was paid, and that therefore plaintiff is estopped from claiming any royalties from the defendant.

It is denied that the defendants are indebted in any sum to the plaintiff, and the prayer is for the dismissal of the petition.

A motion was filed by the plaintiff for an order to inspect and take copies of the records and books of the defendants. The motion was opposed by the defendants. In January, 1948, Judge Morrow entered an order appointing a Master for the purpose of making a private examination of the sales journal, accounts receivable journal, and the ledger of the

said corporation from January 1, 1944. A report was filed by the Master.

The plaintiff, Erwin G. Deye, is a brother of Charles E. Deye, the defendant. The defendant, Charles E. Deye is, and has been for many years, the President of The Quality Engraving and Electrotype Company, a corporation. He is the general manager of the business and the dominating influence in its operations. Charles E. Deye is also a partner, together with his wife, and since 1946, his son, in the partnership operated under the name of Quality Engraving and Electrotype Company. This partnership was created in 1928 and from then on carried on the manufacturing end of the business. The corporation performed the selling and administrative work of the business. The corporation and the partnership operate from the same offices, with the same staff, and under the same general management. All of the Capital Stock of the defendant corporation is owned by the defendant, Charles E. Deye, his wife, Marcella S. Deye, and his son, Walter C. Deye. The close inter-relation of the two separate organizations is admitted. The business of the defendants is the manufacture and sale of electrotypes.

The plaintiff, Erwin G. Deye, worked in his brother's business for many years. He was employed by the corporation before the separation of the business into two legal entities, which occurred in 1928. After 1928 he was employed by the partnership as the foreman of the shop and thereafter became the general superintendent of manufacturing. He had been receiving a salary of $12,000.00 a year for approximately eight years prior to his leaving the employ of the firm on February 7, 1946.

The testimony establishes that about 1937 the plaintiff conceived the idea of a new process in the manufacture of multiple metal molds in the electrotyping process. In general, the idea involved a method of assembling and aligning a number of molds in a frame from which a single electrotype plate could be manufactured, thus simplifying and reducing the cost of printing by means of the composite electrotype plate.

It appears that there were a number of practical difficulties which had to be overcome in order to make this invention of practical value. The plaintiff claims that he spent many hours working on the invention and perfecting it. Some of this work was done in the plaintiff's job and some of it was done on the plaintiff's own time during evenings and weekends at the plaintiff's home.

There is substantial dispute in the testimony as to the exact extent of plaintiff's work on the invention and also as

to the contribution of other employees of the defendant and of the defendant Charles E. Deye himself in bringing the invention to the point of patentability and practical use.

Certain employees of the defendant testified that they had a great deal to do themselves in the development of the idea.

While plaintiff admits that he had some assistance from other employees of the defendant company on his work on the invention, which covered a number of years, he denies that this assistance was of major consequence in developing the device. The plaintiff's testimony of his own efforts in developing the patent was corroborated by the witness Albert Schlattmer, who was the general manager of the Printing Machinery Company during the years 1937 to 1939. This company designed machinery and tools used in the printing industry. He testified as to many discussions with Erwin G. Deye with respect to the invention and particularly with respect to the perfection of certain clips which were necessary for the alignment of the molds in the form. He assisted Erwin G. Deye in perfecting the process and helped him to design certain parts of it, his company being paid for the work done by the defendant, The Quality Engraving and Electrotype Company.

It is the opinion of the court that the plaintiff has established by a preponderance of the evidence that his idea and his work were primarily responsible for the origination of the device and its development into a practical process. It is not disputed that much of the work which was done by the plaintiff was done in the defendant's place of business and on the defendant's time, nor is it disputed that all of the expense involved in the development, including the patent application expense, was borne by the corporate defendant.

The process which was covered by the invention was referred to as the "Step and Repeat" process. This designation or name apparently had been used previously in the engraving, off-set printing and lithographing industries. However, although the process was similar to that used in these other industries, it had never been successfully applied to the electrotype industry, and the "Step and Repeat" phrase had never been applied to the manufacture of electrotypes prior to the invention of the plaintiff. In about 1938 the first order of electrotypes manufactured by the defendant partnership under the "Step and Repeat" method was sold to the United States Printing Company and proved satisfactory. About that time the evidence establishes that the defendant, Charles E. Deye, told the plaintiff that the method appeared to have merit, and that he should go ahead and have it patented and.

that the company would "take care of Erwin" if the method proved profitable. There was no written agreement at that time, which is understandable in view of the relationship between the parties and the closeness of their working associations.

A firm of patent attorneys was employed by the defendant and patent applications were prepared. The first one was filed July 15, 1939 in the name of Erwin G. Deye as inventor. At the time of the application and at the request of the defendant, Charles E. Deye, the plaintiff executed a formal assignment, prepared by the attorneys assigning to the corporate defendant all of his rights to the invention and to any patent which might be issued pursuant to his application. This original patent application was refused by the patent office. Thereupon in 1940, a new and revised patent application was prepared and filed and also another assignment was executed by the plaintiff. This application likewise was rejected by the patent office and on September 4, 1943 an amended application for patent was filed in the name of Erwin G. Deye and the patent on this application was granted by the United States Patent Office in the name of Erwin G. Deye as inventor on December 30, 1947, the patent being No. 2433653 under the title "Manufacture of Composite Metal Molds for Electrotyping." At the time of filing the last amended application in 1943 upon which the patent was granted, the plaintiff, following the request of his brother, Charles E. Deye, made a general assignment of all his rights of his invention and under the patent pending to the corporate defendant.

During the period from 1939 to 1947, while the process was in the state of development and improvement, and while the proceedings were being taken which resulted ultimately in the issuance of the patent, the defendants were using the process under the "Step and Repeat" name in their business. Numerous electrotypes were made and sold under the designation "Step and Repeat" method. Also the defendant corporation placed advertisements in trade magazines advertising the advantages of electrotype molds made under the new "Step and Repeat" method exclusively by The Quality Engraving and Electrotype Company, the advertisements announcing the fact that there was a patent pending on the new method.

Because of the advantages which the new method provided, the plates manufactured under the "Step and Repeat" method were sold by the defendant for a higher price than those assembled under the old "patch" method.

When it appeared that the "Step and Repeat" method had met with trade acceptance, the defendant corporation used the "Step and Repeat" label in connection with the sale to its customers of other electrotypes which were not in fact made under the new process, but which were assembled under the previous method which was known as the "patch" method. The defendant's practice was to charge its customers higher prices for its plates billed as "Step and Repeat" process plates even when the patented method was not in fact used.

The evidence shows that from 1939, or at least 1940 on, the plaintiff was continuously pressing his brother for a definite understanding or specific agreement for compensation in respect of the invention which he had developed, pursuant to the general understanding which the brothers had had that if the invention proved of value Erwin G. Deye would be taken care of. Various suggestions were made by Erwin, such as stock in the corporation, payment by the corporation of the premiums of insurance on his life, and other considerations. However, none of these were acceptable. Charles E. Deye became somewhat irritated with his brother on the ground that he was always complaining and attempting to get more money. However, Charles E. Deye did attempt to solve the difficulty and to satisfy his brother's demands on various occasions. Thus, in 1941 the brothers went to the attorney for the company where the situation was explained and the attorney prepared a written agreement concerning additional compensation. This was refused by Erwin G. Deye. Later Charles E. Dye offered to pay $2400.00 a year to apply to premiums on insurance to be purchased by Erwin G. Deye on his life and to be payable to his wife, but this suggestion never was carried out.

Finally, in May or June of 1944 an oral agreement was entered into between Charles E. Deye and Erwin G. Deye under the terms of which the corporation agreed to pay Erwin G. Deye ten cents per unit on all electrotype units sold under the "Step and Repeat" designation by the company, and in addition thereto, seven per cent commission on all sales made by Erwin G. Deye.

The defendant, Charles E. Deye, at first disputed that there was any agreement made in 1944, his claim being that he had a talk with his brother relating to the understanding in the subsequent year 1945. However, from records in the case and also from the previous testimony of Charles E. Deye at the preliminary hearings in this case, it appears to the court that the defendant, Charles E. Deye, was in error and that the discussion actually occurred sometime shortly prior to July, 1944.

Records of the defendant company introduced in the case prove that actual payments commenced in July, 1944 and that these payments were made retroactively from January 1, 1944.

It should be mentioned at this point that the plaintiff makes no claim in this action for any further commission on sales, his claim being limited to royalties on "Step and Repeat" electrotype plates on the basis of ten cents per unit. The only importance, therefore, of the commissions that were paid to the plaintiff at the rate of seven per cent on sales, is in connection with the establishment of the fact that some agreement was made with the plaintiff in June, 1944 since the commission payments, as well as the per unit payments commenced in July, 1944 and continued until February, 1946.

The checks which were delivered to the plaintiff from July, 1944 through and including February, 1946 were attached to vouchers which designated the payments as "Royalty on Step and Repeat" or "Royalty on S. and R." It also appears in the evidence that the ten cent unit payments were originally entered on the ledger of the company under the designation "Step and Repeat Royalties." However, some time later, probably after the dispute arose between the brothers, the original ledger page showing the payments as "Royalties" were destroyed by Joseph A. Deye, another brother of the defendant, Charles E. Deye, who was the bookkeeper of the company. For the destroyed ledger page, another rewritten page was substituted under which payments were designated as "Step and Repeat Allowances." In passing, it is significant to note that the Master appointed by the court to examine defendants' books was not informed of the destruction of the original ledger sheet and its replacement. He was permitted to assume that the ledger sheet examined by him was the record of original entry.

Similarly, the cash journal of the partnership shows monthly entries commencing with April 11, 1945, of payments made to Erwin G. Deye on the basis of ten cents per unit on all sales of electrotype sold as "Step and Repeat." The journal introduced in evidence shows these payments designated as "Allowances for Step and Repeat." However, under cross-examination, Joseph A. Deye admitted that he had originally recorded these payments on the cash journal as "royalties," and after making numerous entries of this character, erased the word "royalties" and substituted the word "allowances." The books clearly show these erasures and it appears to be the fact that the erasures were made after February 7, 1946, that is to say, after Erwin G. Deye left the employ of the

defendants, because the entry for the month of January, 1946 shows a similar erasure to that which occurs in the preceding months.

The voucher register of the partnership also indicates similar erasures and substitutions of the word "allowances" for "royalties" in the entries recording the payments to the plaintiff.

Joseph A. Deye admitted that he had made the erasures and the substitutions in these books. His explanation was that he had erroneously described the payments as "royalties" in the original recording of these items and that he made the changes in the books in order to conform the records to the facts. He denied that his action in this respect was directed by his brother, Charles E. Deye.

It appears to the court, however, that the combination of circumstances indicates that the probable motive in making these erasures and the change in the designation of the payments from "royalties" to "allowances" was to delete from the books such entries as might corroborate the plaintiff's claim to royalty payments. Whether Charles E. Deye directed these changes is immaterial, since Joseph A. Deye's acts had equal effect to bind the corporation, but it is more than likely that in view of Charles E. Deye's complete domination of the business and of his brother, he was not unaware of these changes.

It is also significant that Joseph A. Deye, who prepared Erwin G. Deye's income tax returns and declarations of estimated income, listed these payments on Erwin G. Deye's individual tax return, which he prepared in the early part of 1946, as "royalty" payments.

Charles E. Deye denied that he had ever made an agreement with Erwin G. Deye providing for royalty payments on the "Step and Repeat" patent. His version of the facts was that Erwin G. Deye was constantly pressing him for increased compensation unrelated to the patent assignment; that the wage stabilization law which was in effect during the war years prevented the company or the partnership from increasing Erwin G. Deye's salary; and that in order to appease his brother he decided to give him an increase in compensation and to avoid the penalties of the law in so doing, by falsely designating these payments as commissions on sales and royalties under the "Step and Repeat" patent.

In other words, Charles E. Deye attempts to contradict the evidence indicating the existence of a contract by asserting that the payments to his brother were not in fact royalties, as they were designated, but were voluntary increases in com-

pensation and were falsely reported as royalties to circumvent the law which prohibited such increases. He admits violation of the Wage Stabilization Law and the income tax law to explain away the book entries which support the plaintiff's claim. Such an admission must be critically examined.

In the light of all the facts, the defendant's "explanation" is unconvincing. The court concludes that the evidence establishes that the plaintiff did enter into an express oral agreement with the defendants. This agreement, in substance, provided that in consideration of the plaintiff's assignment of his invention patent rights to the defendant corporation he would be paid a royalty of ten cents a unit on all units of electrotype billed and sold by the defendant corporation as "Step and Repeat" units. This agreement provided that the measure of compensation to be paid to the plaintiff was to be based upon all units sold under the "Step and Repeat" designation, whether or not these units were manufactured under the patented process. This is the fair interpretation of the evidence based upon the oral testimony, as well as the significant admissions contained in the defendants' own records.

The terms of this agreement represented the final culmination of the arrangements pursuant to the original understanding between the brother that Erwin G. Deye would be compensated, in a manner to be determined in the future, if his invention proved profitable to the business.

In addition to denying the existence of the alleged agreement, the defendants claim that they have no obligation to the plaintiff because, under the circumstances of the case, they acquired a "shop right" in the plaintiff's invention under established principles of law. A "shop right" is a right which, under certain circumstances, the law recognizes in an employer to practice and use, without compensation, an invention developed by an employee. It is, in .effect, a nonexclusive license to use, manufacture and sell the invention without financial obligation to the inventor. A "shop right" arises where an employee, even though not hired by his employer for the particular work of inventing, conceives and perfects an invention during his hours of employment and working with his employer's materials and appliances and at his employer's expense.

Under such circumstances the law considers, on the basis of equitable principles, that since the servant has used his master's time, service and materials to attain the concrete result embodied in his invention, the employer is in equity entitled to use that which is the fruit of his own property and

to do so without further financial obligation to the inventor. These principles are well established by a long line of decisions, examples of which are: United States v. Dubilier Condenser Corp., 289 U. S. 178, 77 L. Ed. 1114; McClurg v. Kingsland, 42 U. S. 202, 11 L. Ed., 102; Solomons v. United States, 137 U. S. 342, 34 L. Ed., 667; Gill v. United States, 160 U. S. 426, 40 L. Ed. 480; Pressed Steel Car Co. v. Hansen, 137 F., 403.

The subject has recently been reviewed by our own Supreme Court in The Gemco Engineering & Manufacturing Co., Inc. v. Henderson, 151 Oh St, 95, 38 O. O. 556 (March 2, 1949).

It is clear, however, that as stated in The Gemco case, supra:

"An employee not under contract with his employer to invent, may protect himself against the establishment or accrual of a shop right in his employer in any invention or device perfected by such employee on his own time and at his own expense though during the period of his employment, by words, acts or conduct which clearly negate the establishment or accrual of such shop right."

While, in the syllabus of The Gemco case above quoted, words are used which indicate the right of an employee to prevent the creation of a "shop right" to an invention created on the employee's own time and at his expense by agreement or conduct inconsistent with a "shop right," this syllabus must be read in the light of the facts of that case. It is not only with regard to inventions which are perfected by an employee on his own time and at his own expense that a shop right may be defeated, but it is likewise true that if the employer and the employee by contract or by other clear cut expression of intention enter into arrangements whereby the employer agrees to compensate the employee for any invention which he may develop, either working on his own time or on the employer's time, then such agreement is effective and determines the relationship of the parties with regard to the invention. In other words, parties may contract as they wish and it is entirely within the rights of an employer to contract away a "shop right" which would arise under equitable principles if no agreement were made. An express agreement supercedes an implied right which would come into existence if the parties remained silent. Brown v. L. V. Marks & Sons Co., 64 F. Supp. 352; Oliver v. Autographic Register Co., 177 A. 680 (N. J.).

Furthermore, it is clear that a "shop right" is merely a non-exclusive right to use as distinguished from an exclusive, absolute right in the patent or invention. The law inclines strongly to the rule that an invention shall be the property

of the inventor and that nothing short of a clear and specific agreement to that effect will vest the property or title to the invention in the employer.

As is very aptly stated in U. S. Colloid Mill Corp. v. Myers, 6 Fed. Supp. 283 (1934 D. C.):

"There is some popular notion that so far as concerns inventions, employees sell their brains to employers, but that is not the law. On the contrary the Supreme Court has thoroughly established that, while certain shop rights in inventions made by an employee while engaged in the work of his employment may accrue to the employer, no title thereto passes unless there be a plain or ambiguous contract by the employee to turn it over to his employer. Only by such a contract can title to the employee's invention be attained."

See also United States v. Dubilier Condenser Corp., 289 U. S. 178; Dinwidde v. St. Louis and O'F. Coal Co., 64 Fed. (2d) 303; Mosby Co. v. Jones, 303 Ill. App. 234, 24 N. E. (2d) 873; Howard v. Howe, 61 Fed. (2d) 577; Restatement of the Law of Agency, Sec. 397; Hapgood v. Hewitt, 119 U. S. 226.

Applying these legal principles to the facts in this case, we conclude that the defendants did not acquire a "shop right" in the invention patented by the plaintiff for two reasons:

First, the evidence indicates that the parties contracted with respect to the situation which would exist if the plaintiff's patent proved profitable in the business, that is to say, they expressly contracted that the plaintiff was to receive a royalty for the assignment to them of his exclusive patent rights.

Second, we are dealing here not with a "shop right" as such, but with the express assignment of a patent. That is to say, the defendants consider themselves to be and are in fact, the exclusive owners of the patent involved by virtue of the voluntary assignment of all patent rights made to the defendant corporation by the plaintiff. In other words, the defendant corporation has acquired the exclusive and absolute right to the use of this invention by grant from the plaintiff, which is much more than the law would entitle it to if it were asserting merely a "shop right." Since the comprehensive rights granted to the defendant by virtue of the absolute assignment could arise only by assignment and not by implication of law under the "shop right" doctrine, the real question before us is not whether a "shop right" exists, but rather whether the assignment was gratuitous or based upon consideration. This question, as we have stated, requires, under the evidence, the answer that the assignment was not gratuitous, but was given in exchange for a promise to pay royalties.

The agreement made between the parties was silent as to the time or term during which these agreed payments were to be made to the plaintiff. However, the law seems clear that in an agreement involving the assignment or license of a patent, when the agreement does not contain express limitations as to its duration, it continues during the life of the patent. **Motor Car Co. v. Packard Co., 124 Oh St, 363.**

It does not clearly appear whether the payments to be made plaintiff were the obligation of the defendant corporation or the defendant partnership. The patent was assigned to the corporation, but plaintiff was employed by the partnership, and royalty payments from 1944 to 1946 were charged to the partnership. But this does not seem of importance in view of the fact that, while technically separated, the corporate and partnership business are closely combined. While the partnership technically employed plaintiff, the corporation, through sales of the units, received the benefit of his invention. Under these circumstances, both defendants may be held.

There is only one other matter to be considered. The plaintiff, at the trial of the case, did not produce evidence showing the number of units which had been sold by the defendant corporation under the "Step and Repeat" designation for the period involved in this action. Such evidence obviously requires an examination of the defendants' records and billings during the years involved. By stipulation during the trial, the parties agreed to permit the defendants' accountants to make such examination and to report their findings to the court. By subsequent stipulation the parties agreed to postpone the work and expense of this accounting procedure until the court decided the merits of the case.

In view of this decision now announced, the court directs the parties to proceed with the accounting determination as to the number of units sold by the defendant corporation under the "Step and Repeat" designation since January 31, 1946 to the date of the filing of the second amended petition, May 25, 1950, or to determine the number of units by agreement between them, if that is possible.

Upon the determination of such facts and the report thereof to the court, judgment may be entered by the plaintiff in accordance with this opinion and on the basis of ten cents a unit of electrotype sold by defendant corporation under the "Step and Repeat" designation during the period above set forth.