DEYE, APPELLEE, *v.* THE QUALITY ENGRAVING & ELECTROTYPE CO. ET AL., APPELLANTS.

(No. 7435—Decided October 29, 1951.)

*Mr. John R. Gehrig,* for appellee.
*Mr. Leo J. Brumleve, Jr.,* and *Mr. David B. Wood,* for appellants.

HILDEBRANT, P. J. This appeal on law and fact is presented to this court on the second amended petition, the answer of defendant corporation, the amended answer of defendant partnership, the record, the exhibits introduced in evidence here, and the arguments and briefs of counsel.

The defendant partnership consists of Charles E. Deye, his wife and son, who also own all the stock of defendant corporation. Both forms of enterprise are operated as one, under the same roof, with the partnership engaged in doing the manufacturing, and the corporation engaged in selling electrotype units, with the defendant Charles E. Deye in the actual management and control of both.

Plaintiff, a brother of defendant Charles E. Deye, was for many years employed in the enterprise, and for a number of years prior to his leaving that employment in January 1946, was plant superintendent at a salary of $12,000 per year.

Plaintiff's claims are based upon an alleged contract negotiated with defendant Charles E. Deye for the payment of "royalties" of 10 cents per unit on units assembled into composite metal molds known as "step and repeat" units, made by the method invented by plaintiff and, finally, on the third application therefor, patented in the name of plaintiff, although in the application therefor the patent rights were assigned to the corporation, which has always been sole owner thereof.

The burden of proving such a contract rests upon the plaintiff.

Defendant denies that the agreement, made and acted upon for approximately two years, even contemplated any payment of royalties as such, but claims it amounted only to an increase in compensation to satisfy the demands of plaintiff made under a threat by plaintiff of leaving his employment with the defendant, and that the agreement took the form it did in order to obviate the salary freeze in effect at the time by federal law.

It therefore appears that decision of this case depends upon the legal effect of what was said and done

between the plaintiff and Charles E. Deye over a period of years.

As to the invention itself, it appears from the record that the idea for a composite metal mold originated with plaintiff who, although not employed to invent, spent much time both during regular hours at the plant and outside in its development, in which endeavor he was joined and assisted by defendant Charles E. Deye and other employees, with all expenses being borne by the corporation, including that of successive patent applications which always bore the assignment by plaintiff of all patents and rights thereunder to the defendant corporation. However, the balance appears to justify crediting plaintiff with the invention sufficiently to make the application in his name, and definite benefits to the business appear to have followed. It, therefore, appears that a reasonable basis of a claim for compensation on part of plaintiff for development of the invention has been established.

Plaintiff testified that at the time of the original patent application about 1939, his brother, Charles E. Deye, said to him: "If this proves out I will take care of you"; and that again, in 1941: "He said, 'listen, if this thing works out, I will take care of you.'" While denying any such statement, defendant contends that the consideration for the patent assignment is to be found in the continued payment to plaintiff of the $12,000 salary after his duties as superintendent had been halved by reason of the sale and discontinuance on the part of defendants of the engraving portion of their business.

It appears from the record that during the five-year period from 1939 until May 1944, plaintiff was intermittently pressing defendant for an increase in compensation based on his expectation of receiving something for his work on the patent and his desire to provide security for his wife in the future in the event

of his own or his brother's death. He testified that he and his brother Charles consulted an attorney in 1941 "for the purpose of stating the compensation—stating the position of the company after a period of time and for—well, extra compensation." As plaintiff expressed it, "well, I had been at him for an agreement for this patent to revert back to me in case something happened to me or in case something happened to him that my wife would be taken care of."

Plaintiff also suggested that he be allowed to ácquire some stock and that an offer of $2,400 the first of each year with which to buy insurance for his wife was never carried into effect. This offer came in 1943, after plaintiff told his brother: "I wanted something for security for the wife in case something happened to me." "Q. Why? A. Because I felt I had something coming and I wanted her protected."

With the foregoing background of events, discussions between the parties, and their conduct thereon prior to May of 1944, plaintiff testified as to the contract relied upon:

"A. We were at lunch together at the Metropole Hotel and as usual lunch was spoiled for me with conversation. I asked him again to do something for me and the answer was no. I asked him to sell me stock in the company, and he said, 'no.' I said, 'well, I can see the handwriting on the wall, I will leave the first of June.'

"Q. What did you mean by that? A. Quit.

"Q. The handwriting business? A. I was promised, and promised, and promised something for the step and repeat and never got it.

"Q. Go ahead. A. So then I went back to the office and he came back in the office.

"Q. Were you in the same office? A. I had a desk in the outer office and he was in the private office, on the same floor, same building. He called me in his

office and he says, 'can't sell you no stock, I can't give you no written agreement.' He said, 'I will tell you what I will do,' he said, 'I will give you seven per cent commission on all the sales that you are responsible for.' I says, 'O. K., how about step and repeat?' He said, 'we will work out something on that.' I said, 'you haven't got a lot of time to work it out because I am not sold on staying later than June 1st, so he called me in'—

"Q. On the same day? A. On the same day, later that afternoon, and he said to me, 'I will tell you what I will do, I will give you ten cents per unit on step and repeat.'

"Q. From when? A. And he says 'I will date it back to January 1, 1944.'

"Q. What did you say? A. I says, 'I will take it.'

"Q. Did anything else happen in connection with this that your brother Joseph was involved in? A. A few days later my brother Joseph was all hot and bothered because he didn't know how to put that on the books, he said, 'What am I going to mark it.'

"Q. Were you present? A. He said, 'You know we can't show this as an increase.'

"Q. Who said that? A. Joe Deye said it, and Charles Deye said to Joseph Deye, 'That is simple, it is royalty.'

"Q. What did Joe say? A. There was nothing further in Joe's conversation. He turned around and went out.

"Q. Prior to this time did Charley ever say he was going to give you royalty? A. Not using that term.

"Q. Did he ever say he was going to compensate you for your invention? A. Yes, he did do that."

Both parties testified that nothing was said as to the length of time the above payments were to continue, stating that no time limit was placed upon it.

Defendant Charles E. Deye denies the statement at-

tributed to him by plaintiff, "that is simple, it is royalty," and the bookkeeper testified that he did not remember the statement being made and corroborated the defendant by testifying that Charles E. Deye criticized his records for showing the unit payments as royalty and directed him to change them. The bookkeeper takes upon himself the responsibility for the nomenclature, as his solution for getting around the government salary freeze regulations and for the erasure from certain of his records of the word, royalty, with the substitution of the word, allowance, stating that he was under pressure from Charles E. Deye who was criticizing the use of the word, royalty, as wrong.

This court fails to find in this record proof of a contract to pay plaintiff royalties as such. Webster's New International Dictionary (2 Ed.) defines royalty: "A duty or compensation paid to the owner of a patent or a copyright for the use of it or the right to act under it, usually at a certain rate for each article manufactured, used, sold, or the like."

At the time this contract was made plaintiff was not the owner of the patent. The corporation was the sole owner thereof, so that the essential basis for a contract for royalties, as such, was not present, and defendant Charles E. Deye testified that a contract for royalties was never within the contemplation of the defendants for the very reason that they already owned the patent. While it is true that the corporation became the owner of the patent by reason of its assignment to the corporation by the plaintiff, in whose name it was obtained, the record shows that over a five-year period defendants refused to agree with plaintiff that any further compensation was due him in consideration of the patent assignment, and it was only when plaintiff threatened to quit the employ of defendant on the 1st of June that his dual claim of being entitled to an increase in compensation for work

done on the patent and for the purpose of protecting the future security of his wife resulted in the offer to which he has testified he accepted.

It, therefore, appears that the offer of increased compensation by way of commission and payment of 10 cents per unit on "step and repeat," was made by defendant in consideration of plaintiff remaining on the job, which offer the plaintiff accepted.

Negativing the claim of a contract for royalties as such is, also, the fact shown by the record that payment was made on articles labeled "step and repeat" and advertised and sold to the trade in that manner, which were actually manufactured by the old "patch" method, rather than only those made by the patented process; and there is testimony that had the 10 cent per unit payments been confined to those made solely by the patented process, the returns to plaintiff would have been so negligible as to be unsatisfactory. Obviously, units manufactured by other than the patented process could not be a proper subject for the payment of royalties.

Since this court does not find proof of a contract to pay royalties as such, it can not imply a contract to make payments for the life of the patent, or beyond the time the plaintiff left his employment. Nor can this court, from the record, sever that part of the contract, agreeing to pay 10 cents per unit on "step and repeat," from that part agreeing to payment of a commission on certain accounts, which surely could not extend beyond the duration of the employment.

Taking this view of the record, the court is not called upon to consider the application of the statute of frauds herein.

The court, therefore, finds the issues joined in favor of the defendants.

*Judgment for defendants.*

HILDEBRANT, P. J., MATTHEWS and ROSS, JJ., concur.