[Civ. No. 23910. Second Dist., Div. One. May 9, 1960.]

AERO BOLT AND SCREW COMPANY OF CALIFORNIA, INC. · (a Corporation), Plaintiff and Appellant, v. JOSEPH ANTHONY IAIA, Defendant and Appellant.

Smyth, Roston & Pavitt and William H. Pavitt, Jr., for Plaintiff and Appellant.

Ralph C. Curren for Defendant and Appellant.

FOURT, J.—This is an appeal by Joseph Anthony Iaia, defendant, appellant and cross-respondent (sometimes hereinafter referred to as "Iaia") and a cross-appeal by Aero Bolt and Screw Company of California, Inc., plaintiff, respondent, cross-appellant (hereinafter referred to as "Aero") from portions of a judgment entered in two consolidated cases tried by the court sitting without a jury.

A résumé of the facts is as follows:

Aero, a California corporation, formed in 1951, has been engaged in distributing certain aircraft hardware, including nuts, bolts, screws, washers, O-rings and cotter pins. Its place of business has been Inglewood, California. Mr. John J. Cassidy manages the business and is its vice-president.

Iaia was hired by Aero in 1951 as an *order clerk*. The official salary account records of Aero describe Iaia *at all times during the course of his employment* by Aero as a *buyer*. Iaia's starting salary beginning January 5, 1951, was $55 per week. This salary was periodically increased until September 2, 1955, when his salary was $120 per week. At each time Iaia's salary was raised, the salaries of other male employees and some clerical employees were raised.

Iaia conceived the inventions which became the subject matter of a patent and patent application in 1952. He filed his first patent application for self-sealing fasteners in the United States Patent Office on April 7, 1953, Serial Number 347,377. This application subsequently was abandoned by him after the filing of a continuation-in-part application Serial Number 435,407 on June 9, 1954. This latter serial numbered application matured to United States Patent Number 2,752,814 on July 3, 1956. Iaia currently has pending a further application Serial Number 516,549, filed June 20, 1955, covering an alleged improvement over the subject matter of said Patent Number 2,752,814.

Aero paid no part of the cost of $3,301.60 expended by Iaia in filing and prosecuting said applications for patent and other applications, both domestic and foreign, relating to self-sealing fasteners and their application.

Iaia, with the full knowledge of Aero, conducted a patent infringement Action Number 20559-Y under Patent Number 2,752,814, in the United States District Court of the Southern District of California, against Lucas Aircraft Supply Company et al. By a consent judgment entered into said action on April 3, 1957, Iaia was adjudged the sole and exclusive owner of the aforementioned patent; with the exclusive right to prosecute actions for infringement thereunder including the right to recover for all past infringements of said patent; and further, that the Letters Patent and the claim thereof was good and valid in law. Notwithstanding its knowledge of the conduct of said Civil Action Number 20559-Y, Aero was not a party to said action, nor did it share in the cost of prosecuting the same, nor in the recovery thereunder.

Iaia and Aero entered into an *oral agreement* in January, 1955, whereby Iaia licensed Aero *exclusively* to manufacture, use, and/or sell self-sealing fasteners embodying the subject matter of any claim in Patent Number 2,752,814, or in Application Serial Number 516,549, or in any patent issuing on the said last application, in the aircraft field. Aero agreed to pay

to Iaia a *royalty* of 20 per cent on the sales of all such fasteners. From July 12, 1955 to January 10, 1958, Iaia received royalties in the sum of $35,198.50.

Iaia and Aero acted under the January, 1955, *oral agreement* from the last mentioned date until Iaia left Aero's employ in November, 1957. In November, 1957, Iaia and Aero entered into another *oral agreement*. Under the agreement Iaia would provide the self-sealing fasteners to Aero in consideration of Aero paying Iaia 20 per cent of Aero's sales thereof. *However, by virtue of this subsequent oral agreement, Aero's rights were no longer exclusive.* Iaia then went into business for himself, still continuing to supply Aero with the fasteners. Between the latter part of January 1958, and the early part of March 1958, a number of fasteners were delivered by Iaia to Aero, the 20 per cent royalty on which totaled $2,957.58. Aero refused to pay the aforementioned sum.

On March 31, 1958, Aero filed Action Number 2008, which was a "Complaint for Damages (Unfair Competition) and Certificate for Assignment and Transfer." In this complaint Aero asserted various acts of unfair competition (i.e. Iaia "appropriated, as his fictitious trade name and style, 'The Uniseal Co.,' although (Iaia) well knew that the trademark Uniseal was the exclusive property of the (Aero) . . .;" appropriation of confidential information; appropriation of Aero's "call-out numbers"; appropriation of a brochure "with only certain slight modifications"; distribution of the aforementioned brochure so that "Aero's customers, actual and prospective, have been, and are being confused as to whether they are doing business with Aero or Iaia; thereby enabling Iaia fraudulently to appropriate to his use and benefit the good will of Aero . . .;" etc.)

In its prayer Aero sought among other things damages, temporary restraining order, preliminary injunction, mandatory injunction, accounting of profits, costs of suit and "such other and further relief as may be deemed just and proper."

On April 18, 1958, Iaia filed his answer to the above complaint and a cross-complaint thereto. Along with the admissions and denials in the answer, Iaia set forth four separate and affirmative defenses. In his cross-complaint, Iaia alleged the indebtedness of Aero in the sums of $2,237.58 and $720 for merchandise sold and delivered and also asked for an accounting.

Aero's answer to the cross-complaint was filed April 28,

1958, wherein Aero admitted the indebtedness, but denied other matters and set up affirmative defenses.

On April 24, 1958, Aero initiated a second action (*i.e.* Action Number 2032), by filing a "Complaint for Declaratory Relief and Certificate for Assignment and Transfer." After setting forth the allegations in this complaint, Aero prayed for:

"1. A declaration of its rights as follows:

"A. The plaintiff (Aero) is entitled to an assignment by defendant (Iaia) of all patents and patent applications . . .

"B. Alternatively, that plaintiff is entitled to royalty-free shopright . . .

"C. Alternatively, the plaintiff is entitled to an exclusive license . . . for the life of all patents granted . . .

"2. For further ancillary relief as follows:

"A. In the event that the Court should declare plaintiff's rights as prayed in paragraph 1A hereof, for a mandatory injunction requiring defendant to execute a full and proper assignment of all such patents and patent applications accordingly.

"B. In the event that the Court should declare plaintiff's rights as prayed in paragraph 1B, for an *injunction against defendant's further interfering with plaintiff's efforts to procure bolts from sources other* than defendant . . . (Emphasis added.)

"C. In the event that the Court should declare plaintiff's rights as prayed in paragraph 1C hereof, for an injunction *against defendant's continuing to make and sell said sealing fasteners* . . . in violation of plaintiff's exclusive license rights. . . ." (Emphasis added.)

Iaia's answer to the aforementioned complaint was filed May 2, 1958. In this answer, there were admissions, denials and three separate and affirmative defenses.

On May 6, 1958, an order consolidating the actions for pretrial and trial was filed. The pretrial conference order in the aforementioned consolidated actions was filed May 19, 1958.

On February 20, 1959, the "Findings of Fact and Conclusions of Law" were filed, and on March 5, 1959, judgment was entered.

Iaia's appeal is "from the whole of said judgment *except* Paragraphs I and II of said judgment." (Emphasis added.) Paragraphs I and II provide as follows:

"I.

"Defendant (Iaia) is the owner of the entire right, title and interest in and to United States Letters Patent No. 2,752,814

and in and to application for United States Letters Patent, Serial No. 516,549 and plaintiff (Aero) has no right, title and interest of any kind in and to said patent, patent applications, or the inventions disclosed therein.

"II.

"Plaintiff (Aero) has no shop right of any kind under the aforesaid patent or patent application or under the inventions disclosed therein."

The remainder of judgment is composed of Paragraphs III and IV. They provide as follows:

"III.

"Plaintiff (Aero) has an *exclusive oral license agreement with defendant (Iaia) for the life of the aforesaid patent* and any patent issuing on the aforesaid application, to make, to have made, to use, to permit its customers to use, and/or to sell in the aircraft field, to the exclusion of defendant, self-sealing fasteners covered by one or more claims of United States Letters Patent No. 2,752,814 and/or said application Serial No. 516,549 and any patent which may issue on the last mentioned application, in consideration for the payment by plaintiff to defendant or his order, a royalty of 20 per cent of plaintiff's gross sales on all self-sealing fasteners sold by plaintiff and so covered by any claim of said patents and/or patent application. (Emphasis added.)

"IV.

"Defendant (Iaia) is hereby and forthwith enjoined from committing any and all of the following acts:

"(a) Using or employing the trademark UNISEAL in the sale of self-sealing fasteners;

"(b) Employing the trade name or style of 'The Uniseal Co.' in any business operated or controlled by defendant;

"(c) Distributing copies of plaintiff's borchure (*sic*), Exhibit 32;

"(d) Selling any sealing fasteners by reference to call-out numbers which are identical with call-out numbers previously adopted by plaintiff as set forth in Exhibit 32;

"(e) Interfering with plaintiff's efforts to procure bolts from outside sources for use or sale in the aircraft field;

"(f) From asserting United States Letters Patent No. 2,752,814 or application for United States Letters Patent, Serial No. 516,549, or any Letters Patent issuing therefrom, against the plaintiff because of its manufacture, use, and/or

sale of self-sealing fasteners in accordance therewith under its exclusive license with defendant in the aircraft field;

"(g) Making, using, and/or selling self-sealing fasteners covered by the aforesaid patent or patent application or any patent issuing from said application in the aircraft field in violation of plaintiff's exclusive license thereunder.

"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT defendant do have and recover of and from the plaintiff the sum of $9,957.16 with interest thereon at the rate of 7 per cent per annum, from the date hereof until paid, less plaintiff's costs and disbursements incurred in this action amounting to the sum of $476.97."

Aero's cross-appeal is from Paragraphs I and II as set forth above, and "If the Appellate Court should reverse either of the decrees contained in Paragraphs I and II . . . said plaintiff further cross-appeals from so much of such final Judgment as:

"(a) ORDERED, ADJUDGED and DECREED, that plaintiff has an exclusive oral license agreement with defendant, as stated in Paragraph III of said judgment, in consideration for the payment by plaintiff to defendant or his order, of a royalty of 20 per cent of plaintiff's gross sales of all self-sealing fasteners sold by plaintiff and so covered by any claim of said patents and/or patent application; and

"(b) ORDERED, ADJUDGED and DECREED that defendant do have and recover of and from plaintiff the sum of $9,957.16 with interest thereon at the rate of 7 per cent per annum."

By reason of the fact that Aero's cross-appeal is from Paragraphs I and II of the judgment, its contentions will be dealt with first.

### I. AERO'S CROSS-APPEAL

First, Aero asserts that the trial court erred in adjudicating that it was not entitled to receive title to the aforementioned patent.

The trial court found true the allegations of Paragraphs I to VI and Paragraph VIII of Iaia's first defense to Action Number 2008. Therein Iaia alleged (1) that he was employed originally as an order clerk on the telephone; (2) that he conceived the self-sealing fastener in 1952; (3) that he disclosed it in that year to Cassidy and was told it was impractical; (4) that subsequently, on his own time and at his own expense, he designed, developed and reduced to practice the fastener disclosed in Patent Number 2,752,814; (5) that he paid all of

the development costs out of his own pocket and was not reimbursed for any expense in that regard; (6) that all development work and drawings were made by him on his own time and at his own cost and expense; (7) that he paid all the patent costs; (8) that he, as sole owner of the patent, spent $3,000 in the period between preparation of the application and issuance of the patent.

Leading authorities in the area of assignment of employee's patent rights are *United States* v. *Dubilier Condenser Corp.*, 289 U.S. 178 [53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488] and *Dalzell* v. *Dueber Watch Case Mfg. Co.*, 149 U.S. 315 [13 S.Ct. 886, 37 L.Ed. 749]. A synthesis of the rules relating to such assignments would be either (a) where the employee is hired to invent (i.e. has a duty to invent) or (b) where even though there was no duty to invent, that it was part of the employment contract that if there should be an invention, that the employee would assign the title thereof to the employer. (See *Consolidated-Vultee Aircraft Corp.* v. *Garbell*, 204 F.2d 946.)

Although there is substantial evidence in the record negating any assertion that Iaia was hired to invent, Aero made a motion, under rule 23, that this court make additional findings of fact. In Aero's "Draft of Proposed Findings Pursuant to Rule 23(a)," it is stated:

"C. Prior to the respective dates when the inventions claimed in the patent and patent application in suit were made (i.e. April, 1954 and August, 1954), *Joseph Anthony Iaia was hired by Aero Bolt and Screw Company of California, Inc. to invent the subject matter so claimed in said patent and patent application.*" (Emphasis added.)

A careful examination of the voluminous record renders this proposed finding untenable. Respondent's motion under rule 23 is denied. There is no substantial evidence of a contractual obligation to assign, nor that Iaia had a duty to invent (i.e. hired to invent), therefore Aero does not come within the purview of the rule set forth above.

Secondly, Aero asserts that the trial court erred in not granting it a "royalty-free shop right."

A shop right is the nonexclusive right to practice any invention made by an employee. It is well settled that the mere existence of the employer-employee relationship is not by itself sufficient to entitle the employer to partake of the benefits of the employee's inventive genius. (61 A.L.R.2d 356, 363.) A statement of what constitutes a "shop

right'' is found in *United States* v. *Dubilier Condenser Corp.*, *supra*, 289 U.S. 178 wherein the court stated at page 188:

''. . . where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention. (Citations.) This is an application of equitable principles. Since the servant uses his master's time, facilities and materials to attain a contract result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business.''

 The trial court found that Iaia, on his own time, and at his own expense, designed and developed the fastener; that he paid for all of the development costs out of his own pocket and was not reimbursed for any expense in that regard; that he paid all patent costs.

The record is replete with testimony that Iaia worked on the drawings in the evenings and on holidays at his home. An employee of Aero, who sat in the same room at work and another employee in an adjoining room and who between them were there from 1949 to the date of trial, testified that they never saw Iaia start a drawing while at work for Aero. There is testimony that there were no drafting facilities whatsoever at Aero's office. Aero's Mr. Gerhardt admitted that there was no drafting board until May of 1955, *after Aero was selling fasteners.*

Aero sets forth specific claims of assistance, which, it asserts causes the doctrine of ''shop rights'' to come into existence.

''(1) Appellant (Iaia) received a drafting table from respondent's (Aero's) officer, Gerhardt, on or about January 1, 1953, which table appellant (Iaia) took to his apartment for use in doing his drafting work''; this board belonged to Gerhardt and was being stored for him. Mr. Gerhardt testified that he gave the board to appellant ''without any strings connected to it whatsoever.''

''(2) In preparing various tables for the self-sealing fasteners, appellant (Iaia) used at home an 'A.N.' 'spec' book *which he claimed was picked up from respondent's (Aero's) rubbish pile when respondent (Aero) moved its location*; (Emphasis added.)

''(3) Appellant (Iaia) made many of his calculations on pads which he obtained from respondent (Aero)''; (the record shows that the computations were made at home by Iaia.)

"(4) The typing on the first drawing submitted to prospective manufacturers, was done by one of the women employees in respondent's (Aero's) office"; (the typing and photostating was for submission to manufacturers).

". . . . . . . . . ."

"(6) Appellant (Iaia) used bolts for his early models and prototypes which respondent (Aero) had in its stock. He also used Teflon which respondent (Aero) had available."

Cassidy of Aero testified that it was customary for any employee to be permitted to take home small quantities of parts for personal use. Also, a stock of ordinary bolts from which Iaia made the prototypes was available at Helix and Beaver Manufacturing Company, and Iaia could not remember where he got them.

"(7) Appellant (Iaia) worked at Beaver Manufacturing during normal working hours; . . ."

The reference to Iaia's testimony is to testimony that Iaia *did not* work at Beaver during normal working hours. The reporter's transcript states:

"Q. Now did you ever go down to Beaver during working hours in 1953? A. I would go down there during lunch hours, lunch time.

"Q. And would you ever stay over past lunch time? A. I never did any work during lunch hour, if that is what you mean.

"Q. Well, on the normal working hours? A. No; if I did, it was on Aero Bolt business."

"(8) Appellant (Iaia) also made samples at the Helix shop during working hours";

The reporter's transcript sets forth:

"THE COURT: Don't try to get at something. He is only asking you when you were working on week-ends at Helix were you working for Aero Bolt. Is that what you were doing? You were working on this self-sealing fastener or were you working for yourself?

"THE WITNESS: I was working for myself."

Iaia testified that he may have made samples during working hours but he doubted he did in 1953. The plastic blocks and samples were for advertising purposes, not for development.

"(9) When appellant (Iaia) worked week-ends at Helix on making samples, although he contended that he was working for himself at all times in 1954 and 1955, he admitted that, when he injured his eye on a Sunday in 1955, he went to respondent's (Aero's) doctor";

Iaia did not dispute that he injured his eye while making the *plastic blocks* in November of 1954, used by the salesmen for demonstration purposes.

"(10) There were numerous expenditures made by respondent (Aero) for items which were used in the testing and completion of the two inventions. . . ."

The record discloses that these expenditures were in connection with *sales*.

It would appear that Aero takes the position that any contribution, *regardless of how trifling*, is sufficient to bring shop rights into existence. Factually, the cases cited by Aero do not support this contention. (See *Callahan* v. *Capron Co.*, 280 F. 254; *Jencks* v. *Langdon Mills*, 27 F. 622; *McAleer* v. *United States*, 25 Ct. Cls., 238, aff'd. 150 U.S. 424 [14 S.Ct. 160, 37 L.Ed. 1130].) In the Callahan case the court stated that while the materials supplied by the employer were of slight value, yet there was evidence *"that a substantial amount of the plaintiff's own time, as well as the time of a skilled tool maker, was devoted to this work at the expense of defendant."* (Emphasis added.)

In urging a shop right, Aero ignores the findings as to when, how and at whose expense the fastener was created. No case is cited where the employer entered into a licensing agreement providing for royalty payments, and was then given a royalty free shop right. In the case at bar there were two licensing agreements (i.e. 1955 and 1957) both calling for the payment of royalties. In *Brown* v. *L. V. Marks & Sons Co.*, 64 F.Supp. 352, at page 356 it was stated: *"There can be no claim for shop right where the parties have agreed on a royalty basis."*

Respondent cites *Gate-Way, Inc.* v. *Hillgren*, 82 F.Supp. 546, for the proposition that there is nothing inconsistent with *both* a "shop right" and an oral license. (P. 554.) However, there is nothing in that case to indicate that the license agreement called for the payment of royalties.

■ We do not think it to be the case, but even assuming that a shop right had come into existence, as stated in *Deye* v. *Quality Engraving & Electrotype Co.*, 100 N.E.2d 310 (rev'd. on other grounds, 90 Ohio App. 324 [106 N.E.2d 584]):

". . . parties may contract as they wish and it is entirely within the rights of an employer to contract away a 'shop right' which would arise under equitable principles if no agreement were made. *An express agreement supersedes an*

*implied right which would come into existence if the parties remained silent.''* (Emphasis added.)

Those portions of the judgment appealed from on the cross-appeal (i.e. that [Aero Bolt] is not entitled to an assignment of the patent nor a royalty free shop right) are affirmed. Iaia's motion to dismiss the cross-appeal is denied.

## II. IAIA'S APPEAL FROM PARAGRAPHS III AND IV OF THE JUDGMENT

Iaia's first assertion is that the contract of January, 1955 is unenforceable under the statute of frauds.

Section 1624 of the Civil Code provides in pertinent part as follows:

"The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent:

"1. An agreement that by its terms is not to be performed within a year from the making thereof;

" . . . . . . . . . .''

It is stated in 23 Cal.Jur.2d, Frauds, Statute of (II), section 11 that:

"An express oral license to manufacture a patented device is unenforceable under the statute of frauds if the terms of the license are not susceptible of performance within one year after the license is granted. Thus, an oral promise to manufacture a patented device for the duration of the patent is unenforceable, since it is one which is obviously not performable within the space of a single year." (See *Gate-Way, Inc.* v. *Hillgren, supra,* 82 F.Supp. 546; *Schick Service* v. *Jones,* 173 F.2d 969 (9th Cir.)).

In the recent case of *San Francisco Brewing Corp.* v. *Bowman,* 52 Cal.2d 607 [343 P.2d 1], it was stated at page 619:

*"We think both the express and implied terms of a contract are equally terms of the agreement within the meaning of that phrase as used in the statute . . . ., if the contract did carry within it an implied agreement that it should endure for a reasonable time, and if in fact such reasonable time amounted to a period in excess of the period allowed by the statute, then the contract being wholly oral could not be enforced.''* (Emphasis added.)

The trial court made three (3) different findings of fact as to duration of the license agreement of January, 1955. Finding Number III provides:

"III.

"... and there was no express provision as to the duration of the exclusive license under said agreement. . . ." (Emphasis added.)

Finding Number V in part incorporates a portion of the allegations in "Plaintiff's and Cross-defendant's 'Affirmative Defense to First Cause of Action of the Cross-Complaint,'" and in part has a specific finding on the issue of duration. Finding Number V states in pertinent part:

"V.

"... In the circumstances, it was contemplated that this exclusive license would be for the life of the patents . . .; that the time for the duration of the June 1955, agreement was reasonable." (Emphasis added.) There was no finding on the issue of statute of frauds.

Defendant (Iaia) filed his "Motion for New Trial" on March 16, 1959, and his "Points and Authorities on Motion for New Trial" on March 20, 1959. Iaia asserted therein among other things that the oral license was invalid under the statute of frauds. In the trial court's "Memorandum of Ruling on Motion for a New Trial" filed on April 29, 1959, it is stated in pertinent part:

"Defendant's principal contentions on this motion for a new trial are:

"1. The oral license is invalid under the Statute of Frauds.

" . . . . . . . . . . . . .

"It is to be noted that defendant's (Iaia's) present counsel was not defendant's (Iaia's) trial counsel. This might explain the fact that *none* of these contentions were made during the trial, and are now being raised for the first time."

The record is replete with evidence that the issue of the statute of frauds was before the trial court, and therefore, was *not* being raised for the first time in the motion for a new trial. ▪▪▪ In *Estate of Bullock,* 133 Cal.App.2d 542 [284 P.2d 960], the court stated at page 549:

"While the memorandum of the trial judge may be used for the purpose of explaining his decision, it cannot be used to impeach the findings and judgment." (See *Southern California Freight Lines* v. *San Diego Ry. Co.,* 66 Cal.App.2d 672, 676 [152 P.2d 470].)

▪▪▪ The memorandum in the case at bar does at least set forth that the trial judge failed to pass upon the issue of statute of frauds when he made his findings and rendered judgment.

The issue of statute of frauds was raised in the trial court in at least the following ways:

1. By THE PLEADINGS.

In plaintiff's (Aero's) complaint filed in Action Number 2008, it was alleged in pertinent part:

"7. . . . plaintiff permitted defendant to apply for patents thereon in his own name, *upon an oral agreement with defendant (Iaia) that plaintiff would at all times, be entitled to the exclusive right to make or have made, to use, to sell, and to authorize its customers to use sealing fasteners . . .*" (Emphasis added.)

Defendant's (Iaia's) answer to the complaint in Action Number 2008 provides in pertinent part:

"IV.

"Defendant, Joseph Anthony Iaia, *denies*, generally and specifically, each and every allegation of Paragraphs 4, through 22 of the complaint." (Emphasis added.)

In *San Francisco Brewing Corp.* v. *Bowman*, 52 Cal. 2d 607 [2] [343 P.2d 1] the Court set forth at page 618:

"But *plaintiff denied the making of the contract in toto and that has been held sufficient to justify reliance upon the statute of frauds.* (23 Cal.Jur.2d, Frauds, Statute of, § 150, p. 440, citing *Feeney* v. *Howard*, 79 Cal. 525 [21 P. 984, 12 Am.St.Rep. 162, 4 L.R.A. 826]; *Harris* v. *Frank*, 81 Cal. 280 [22 P. 856]; *Walsh* v. *Standart*, 17 Cal. 807 [164 P. 795].)"

In plaintiff's (Aero's) Complaint in Action Number 2032, it is stated in part as follows:

"10. . . . plaintiff and defendant entered into an oral agreement whereby plaintiff *would, at all times,* be entitled to the exclusive right to make, and have made, use, sell, . . ." (Emphasis added.)

Defendant's (Iaia's) answer to the above complaint provides:

"VII.

"Defendant, Joseph Anthony Iaia, is without information or belief sufficient to form an opinion as to the truth of the allegations of Paragraph 10 of the complaint and, therefore, denies the same."

Where the matter is presumptively known to the defendant, this form of denial does not raise an issue. However, since the allegations as to the contract are almost precisely the same in Actions Number 2008 and 2032, and there is an unequivocal

denial in Action 2008, and since both actions were consolidated for trial, a valid denial which does raise the issue of statute of frauds is in the record.

2. BY THE PRETRIAL CONFERENCE ORDER.

The pretrial conference order provides in pertinent part as follows:

"Generally the issues of law are as follows:

"1. *Statute of frauds as applied to the alleged license agreement of 1955.*" (Emphasis added.)

 It is established that the pretrial conference order controls where inconsistent with the pleadings unless modified at or before the trial. (*Dell 'Orto* v. *Dell 'Orto,* 166 Cal.App 2d 825, 831 [334 P.2d 97]; *Baird* v. *Hodson,* 161 Cal.App.2d 687 [327 P.2d 215]; 2 Witkin, California Procedure, 1959 Supp., p. 144, § 30F. Therefore, even if assuming that the issue of statute of frauds was not raised by the pleadings themselves, it was clearly raised by the pretrial conference order.

3. IAIA'S MEMORANDUM OF POINTS AND AUTHORITIES.

In the memorandum filed May 19, 1958, it is stated:

"X.

"AN ORAL AGREEMENT WHICH CANNOT BE PERFORMED BY ITS TERMS WITHIN ONE YEAR IS INVALID UNDER THE STATUTE OF FRAUDS UNLESS A NOTE OR MEMORANDUM THEREOF IS IN WRITING AND SUBSCRIBED BY THE PARTIES TO BE CHARGED. *California Civil Code,* Section 1624."

4. REPORTER'S TRANSCRIPT.

Mr. Mahoney, the then counsel for Iaia stated to the court:

"Next, that the Court declare *that since this alleged exclusive license agreement is one which by its nature, and as alleged by the plaintiff, was good for all time, that this agreement incapable of being performed within one year, falls within the scope of the statute of frauds*"; (Emphasis added.)

5. MOTION FOR NEW TRIAL. (See *supra.*)

From the above, it is apparent that the issue of the statute of frauds was raised at least five times in the trial court. Whether the agreement of 1955 is enforceable is, of course, pivotal to other issues in the case. Failure to find on a material issue will ordinarily amount to reversible error.

 The principle announced in *Edgar* v. *Hitch,* 46 Cal.2d 309 [294 P.2d 3] is applicable to the case here. In the Edgar

case, the trial court failed to make an express finding on the defense of "Accord and Satisfaction." The plaintiff argued that a ground existed upon which the trial court could properly find that the defendant had not proved his defense. The Supreme Court stated at page 312:

"Even if the record be viewed as showing substantial evidence of bad faith (citation), before the judgment may be affirmed it must appear that the trial court held for the plaintiff because the defendant failed to prove that the accord and satisfaction was the result of a bona fide dispute.

"Section 632 of the Code of Civil Procedure required the trial court to make findings on the material issues in the case, and the findings must be examined to determine whether the judgment was based on the defendant's bad faith. *The defendant is entitled to a finding on the validity of his defense* of accord and satisfaction. (Citations.) *In the absence of such a finding, sufficient support for the judgment for plaintiff cannot be ascertained. Therefore, under the circumstances here presented a failure to make a finding on the defense . . . would constitute prejudicial error.* (Citations.)

"The court did not *expressly* find that the defendant's claim was made in bad faith; for that matter, it did not even make an express finding rejecting the defendant's plea of accord and satisfaction for any reason. . . . *Therefore, the judgment must be reversed unless from the express finding it is possible to imply a finding* that the defense of a subsequent accord and satisfaction was unmeritorious because no bona fide dispute was proved. (Citations.)

"*Such a finding cannot reasonably be implied. The record indicates that the trial court did not even pass on the defense. . . .*" (Emphasis added.)

While the trial court's memorandum states other reasons why it would not permit the defense of the statute of frauds, the initial statement that said defense was being raised for the first time leads to the inescapable conclusion that the trial court did not consider the defense.

For the reasons stated, those portions of the judgment appealed from by appellant (Iaia) are reversed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied June 3, 1960, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied July 6, 1960.