SCHMIDT v. CENTRAL FOUNDRY CO. et al.

(Circuit Court of Appeals, Third Circuit. January 12, 1916. Rehearing Denied February 9, 1916.)

No. 1991.

PATENTS ⬤═328—VALIDITY—UTILITY OF DEVICE.
    The Schmidt patent, No. 924,840, for an improvement in pipe couplings, claims 1 and 3, *held* void for lack of utility.

Appeal from the District Court of the United States for the District of New Jersey; Thomas G. Haight, Judge.

Suit in equity by Charles R. Schmidt against the Central Foundry Company and others. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 218 Fed. 466.

Connolly Bros., of Washington, D. C. (Thomas A. Connolly and Joseph B. Connolly, both of Washington, D. C., of counsel), for appellant.

Charles Neave and Clarence D. Kerr, both of New York City, for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. The patent in suit, which was issued to the plaintiff, Charles R. Schmidt, on June 15, 1909, is for an improvement in pipe couplings, and relates "particularly to couplings for cast iron pipes wherein the interfitting faucet and spigot ends are tapered and machined or ground to produce a tight joint." The District Court dismissed the bill (218 Fed. 466) on the ground that

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Schmidt—who had been the vice president and manager of the defendant company while he was developing the invention and was applying for the patent—had impliedly licensed the company to use the coupling and was therefore estopped from recovering damages for infringement.

We do not indicate any disapproval of the opinion below, but we feel disposed to decide the case on the ground that the claims in suit are invalid. The field of the patent is very narrow, as the following paragraphs from the specification will show:

"My invention has for its object the provision of novel means for producing a perfectly tight joint in couplings of the above-mentioned character, and in order to accomplish the desired result I so construct the faucet end of each pipe section as to render the same elastic, to that it will yield under the strain imposed upon it by the spigot end or entering member of the adjacent pipe section and accommodate itself to inequality or unexactness in the shape of the spigot end, due to imperfect workmanship, and will also permit of adjacent sections of pipe being perfectly joined, even though they are laid somewhat out of exact alinement. I produce the required elasticity of the faucet section by enlarging the bore of the faucet section adjacent to the tapered portion, so as to diminish the thickness of the wall of the faucet member and render the same expansible and elastic to a sufficient degree to accomplish the desired result."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"This enlargement of the bore or cavity of the faucet section in the rear of the tapered portion provides the required elasticity for the accomplishment of the first object hereinbefore set forth and constitutes the most important feature of my invention, and the manner in which the elasticity so provided is utilized in the provision of a perfectly tight joint will be hereinafter described."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"The parts as described are preferably made of cast iron, and when the adjacent ends of pipe sections are to be joined, the spigot end of one section is inserted in the faucet end of an adjacent section and bolts 5 are passed through the holes in the lugs of both sections, and when the bolts are tightened up by screwing up the nuts with which they are provided the two sections are drawn tightly together and form a perfectly tight and water or gas proof joint. If desired, the clamps 15 are also applied as shown in Fig. 2, and serve to hold the members tightly together in the event of the bolts failing to do so. In drawing the sections together, the faucet section yields or expands slightly owing to its elasticity, so that when the coupling operation is completed the spigot end will be tightly and snugly fitted in the faucet end, notwithstanding any slight irregularity that may exist in either section, and notwithstanding any slight deviation in axial alinement of the two sections that may occur."

Nothing described in the foregoing paragraphs is new, unless it be the annular groove that is the chief object of the patent. This is produced by—

"enlarging the bore of the faucet section adjacent to the tapered portion so as to diminish the thickness of the wall of the faucet member and render the same expansible and elastic to a sufficient degree to accomplish the desired result."

The claims in issue are 1 and 3, and they are similarly restricted:

"1. In a coupling for pipes, a coupling section having a tapered spigot end, in combination with a faucet section having a tapered faucet opening to receive said spigot end, the sections being provided with means for drawing them together, and the bore of the faucet section being enlarged adjacent the inner

end of the tapered portion thereof and being sufficiently elastic at said enlargement to expand when the sections are drawn tightly together.

"3. In a coupling for pipes, the combination of an exterior tapered spigot section with an interiorly tapered faucet section and means for drawing said sections together, the bore of the faucet section being enlarged at the rear of the tapered portion and being elastic at such enlargement, the inner walls of the enlarged portion being formed on curved lines."

It should be noted that the object of the patent is not to secure flexibility of the joint. The object is to increase the elasticity of the wall of the pipe itself, so that when the spigot end is forced into the faucet end the force shall compel the metal of the faucet to expand slightly and thus to admit the spigot a little more completely in order to make a tighter joint. The patentee's theory is that he will secure the needed elasticity by making the metal thinner close to the tapered portion, and for this purpose he provides the annular groove referred to. But whether he does in fact secure the elasticity he seeks is so much in doubt that we cannot regard it as proved. He did not testify himself, and the only evidence to support the theory was offered in rebuttal, and is so unsatisfactory that we cannot rely upon it safely. It consists of several mechanical tests that were made at the patentee's instance, but the value of the evidence is much impaired by the facts that the tests (1) were altogether ex parte, and (2) were not comparative. In other words, the witness tested certain couplings that were furnished to him by the patentee, but no tests were made of couplings that lacked the groove in question, and moreover all the tests were made without the defendant's knowledge. We have no evidence therefore concerning the fact of the increased elasticity, and (theory for theory) we have a positive expert opinion that the groove will produce no such result as the patentee hoped. In the ordinary case, an infringer is not permitted to deny the utility of the invention; but the acts of infringement complained of here were practically committed by Schmidt himself while he was acting for the foundry company as one of its responsible officers. On the ground, therefore, that the utility of the patent is not apparent, and that upon all the evidence we cannot avoid the conclusion that the groove in question serves no useful purpose, we are obliged to hold that the claims in suit are void.

The decree dismissing the bill is therefore affirmed.