## DOVEL et al. v. SLOSS–SHEFFIELD STEEL & IRON CO.

### No. 10592.

Circuit Court of Appeals, Fifth Circuit.

Nov. 22, 1943

Hugh A. Locke, of Birmingham, Ala., for appellants.

E. L. All, of Birmingham, Ala., for appellee.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

SIBLEY, Circuit Judge.

The complaint, originally filed in a State court in 1937, consists of forty odd counts, each asserting a claim for the reasonable value of the use during a period of ten years of one of seven patents granted to plaintiff-appellant James P. Dovel for improvements in blast furnaces. Seven counts are based on an express contract to pay; seven others on implied contracts, and the rest introduce variations caused by assignments to James P. Dovel & Co., Inc., of the patents during the period. Further notice of the assignee is unnecessary. An aggregate sum of twenty-eight hundred dollars was claimed at first in the State court. By amendment the claim was raised to many millions and the suit was removed to the federal court. There the defendant Sloss-Sheffield Steel & Iron Co. by answer admitted the plaintiff Dovel's ownership of the patents and that it has used them in its business, but denied the express contract, and averred that the installations were made by plaintiff while he was an officer and employee of defendant in charge of its blast furnaces, at the expense of defendant and under circumstances which entitled it to use them, and that nothing is due. Limitation, laches, and estoppel to make the claim are specially pleaded. The evidence for the plaintiff was presented to a jury, and on defendant's motion the verdict was directed in its favor and judgment entered. Plaintiff appeals.

The record presents no evidence of an express contract to pay for the use of the patents. Such a contract was contended to have been made in 1909 when the plaintiff first entered defendant's employ as superintendent of maintenance and con-

struction of its blast furnaces. The then officials of defendant are now dead and the plaintiff is disqualified to testify as to the terms of his employment. Plaintiff offered as his evidence of a contract to pay him for the use of such inventions as he might make a copy of a letter which he wrote on Dec. 28, 1918, to President McQueen, now deceased,[1] suggesting payment of royalties on certain of his patents then used by defendant. No reply appears, but on July 20, 1921, plaintiff executed five formal licenses to defendant to use five of his patents, one for a consideration of $4,500, and each of the other four in consideration of $1. The court rejected this evidence, and we think correctly. All the patents but one now in controversy were conceived, applied for and granted after 1921, and all while plaintiff was in defendant's employ. The letter states that it refers to inventions which plaintiff brought with him when he was first employed. He said in the letter there was an agreement that he was to be paid for their use if they were successful, but that is a mere self-serving declaration and no proof of that fact. The defendant evidently did not concede it had promised to pay any royalties, for none were ever paid. Two and a half years later it did pay $1 each for the licenses to use four patents, and $4,500 for the fifth, to continue during the life of the patents. Whether this was by way of compromise, or for past or future use, does not appear. It seems to be a transaction separate and apart from the patents before us now, with no tendency to prove the contract alleged, and insufficient to show a course of conduct whereon the plaintiff could rely in permitting a use of future patents. Another letter dated June 25, 1928, to President Morrow, relates to the later patents now in controversy and also then in use by defendant, but it makes no claim for royalties or other compensa-

tion for such use. It merely invites defendant to buy the southern rights in these patents so that plaintiff would be relieved of embarrassment as to licensing nearby competitors. This letter, so far from proving any contract to pay royalties, indicates that plaintiff was not then making any claim for defendant's use of his patents, or suggesting that it needed a license. Thus the counts alleging an express contract to pay for the use wholly fail.

All the inventions now in controversy were conceived, developed, patents applied for and granted while plaintiff was the full time employee of defendant as manager of furnaces at a salary of $6,000 per year, or as vice-president in charge of furnaces at a salary first of $15,000 and later $25,000 per year. They all relate to improvements in blast furnaces, and were all used by defendant, even before patents were granted, at the instance and request and on the orders of plaintiff, at the cost and expense of defendant, and without any demand or request by him for payment. For instance, the principal patent, later divided into three, which relates to bronze cooling blocks to preserve the furnace from overheating due to failure of the brick lining, and thus prolonging the life of the furnace and lining, was conceived and put to a practical test in the defendant's plant in the winter of 1922-23, the patent was applied for Sept. 17, 1923, but not finally granted, as subdivided, until Feb. 26th, 1929. The successful practical use in several of defendant's furnaces meanwhile was of aid in obtaining the patent. The other patents were likewise put to a practical test at defendant's expense in its plant. In 1928 in a publication by defendant touching its improved methods, full credit is given to these Dovel patents, and this publicity must have greatly aided him in his sale of licenses to others, for which business he maintained

---

[1] Mr. J. W. McQueen, President:
Dear Sir:
* * * When I came with this Company I brought with me some valuable inventions, which were installed first in an experimental way under an agreement with the then General Superintendent that, should they prove successful, they would be adopted and paid for. They have been applied to all of our furnaces (and a number of other furnaces) and have demonstrated their great value and have played a very important part in improving our furnace practice and especially the grade of iron made. I have never made any demand on this Company for payment of royalties, and do not intend to at this time unless it meets your approval. Owing to our phenomenal earnings and successful operations, for which these inventions have been no small factor, I think the Company should pay the royalties * * * I am addressing you in a purely personal way, knowing that if you see the justice in the proposition you will find the correct solution and will authorize me to bill the Company for royalties. For several reasons I thought it advisable to bring this to your attention at the present time.

a separate organization. In 1926 and 1927 two furnaces were rebuilt embodying these improvements under plaintiff's direction, at a great outlay, and the improvements embodied in these and added to others could not be removed except at great cost. Plaintiff retired from defendant's employ Dec. 31, 1929, and made no request for any settlement for the use of the patents. His first intimation that he would claim compensation was six and a half years later, when a demand was made and declined. The patent for a heat recuperator was granted in 1919 and used by defendant in defendant's business earlier. There is no explanation why it was not dealt with in 1921 when the licenses for other patents then in use were executed. All these facts appear without contradiction.

It does not appear that plaintiff was employed to make inventions, so that his employer was not entitled to an assignment of these patents. No such claim is made. The initial experimentation, not amounting to practical tests, appears to have been made at plaintiff's expense, as were his drawings, and the obtaining of the patents. No "shop rights" accrued to the defendant because of the use in making the inventions of its tools and materials, or his time which should have been used in its service. The case therefore comes down to this question: Does a right similar to a shop right arise in defendant to use the inventions in its business because its full time employee, having control of its business to which the inventions specially apply, prior to the issuance of patents and to commercial success, procured their first test and use in that business at the cost and risk of his employer, with no intimation that he expected to charge for such use; the installation being permanent in its nature, involving a large outlay and requiring serious rebuilding of the plant if abandoned; and this use and his employment continuing for years, and more than six years elapsing after the employee had retired from the employment before any assertion was made of his adverse claims as patentee? We think that in such circumstances the patentee is estopped to claim from his employer compensation for past use or to object to continued use of the patented improvements. It is settled that the relation of the United States to its employees in respect to inventions made by them is no different from that of private employers. United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct.

554, 77 L.Ed. 1114, 85 A.L.R. 1488. Therefore decisions on the rights of the United States are applicable here. This case is substantially controlled by Gill v. United States, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480. Quite similar also is Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049; although it being a suit for equitable relief, laches might be leaned on as a defense more heavily. This court, in a suit at law, has upheld a defense of estoppel and laches, under defensive equitable pleadings in some respects much like this case: Ford v. Huff, 5 Cir., 296 F. 652. See, also, Walker on Patents, Deller's Ed. § 376. We are of opinion that on the facts appearing no verdict for the plaintiff could lawfully be rendered. One of the minor patents was first used elsewhere, but this does not alter substantially the picture as a whole. The judgment is affirmed.