James C. **HOBBS**, Petitioner,

v.

**UNITED STATES** of America, Atomic
Energy Commission, Respondent.

No. 20840.

United States Court of Appeals
Fifth Circuit.

April 7, 1967.

Richard B. Montgomery, Jr., New Orleans, La., H. Struve Hensel, Washington, D. C., B. D. Watts, Cleveland, Ohio, for petitioner.

Joseph F. Hennessey, Gen. Counsel, AEC, Sidney G. Kingsley, Asst. Gen. Counsel, AEC, Roland A. Anderson, Asst. Gen. Counsel, AEC, Alan S. Rosenthal, Edward Berlin, Robert V. Zener, Attys., Dept. of Justice, John W. Douglas, Asst. Atty. Gen., Washington, D. C., for respondent, John A. Horan, Atty., AEC, Washington, D. C., of counsel.

Before WHITAKER,* Senior Judge, and WISDOM and THORNBERRY, Circuit Judges.

WISDOM, Circuit Judge.

James C. Hobbs seeks just compensation for the Atomic Energy Commission's taking of rights in certain inventions useful in the production of fissionable material. He asks this Court to review an adverse decision of the AEC's Patent Compensation Board[1] and the Commission's refusal to review the Board. See Atomic Energy Act of 1954, § 189(b), 42 U.S.C. § 2239(b). We reverse the Patent Board's decision and remand the case to the Board for further consideration.

\* \* \*

In 1943 the United States hurried toward completion of its first atomic energy facility at Oak Ridge, Tennessee. The goal of the Manhattan Engineering District was to produce the world's first nuclear weapons. A private contractor, the Kellex Corporation, was in charge of building the Oak Ridge complex. One of the major problems facing Kellex in the Summer and Fall of 1943 was the engineering of a process to separate fissionable Uranium 235 from ordinary Uranium 238. In order to solve this problem as quickly and as efficiently as possible, Kellex persuaded Hobbs, a mechanical engineer of excellent reputation, to work half time as a consultant on the project. Hobbs joined Kellex as a consultant in September, 1943, but refused to sign the patent waiver form Kellex requested. He had made numerous inventions during his career, he explained, and it was his custom to retain all patent rights. Although there is a dispute whether Hobbs and Kellex specifically agreed that Hobbs was to retain all rights to any inventions he might make, the record shows that Hobbs made his position clear. He refused to assign or license any of his anticipated patent rights either to the government or to Kellex.

Kellex's government contract was also clear. It provided that the Contracting Officer had the right to determine whether inventions conceived during the course of the contract should be patented and that he would determine the rights of the parties under any patents obtained. The contract also required Kellex to secure patent waiver forms in favor of the government from those of its employees from whom Kellex would ordinarily require such forms. It was not until July 1944, however, that the government became aware of Hobbs' refusal to execute a waiver form.

After September 1943 Hobbs concentrated on improving the piping systems at the Oak Ridge project, often devoting more than half time to the job. Almost from the beginning, he formed the opinion that the valves Kellex contemplated using were inadequate. In attempting to devise more workable valves, Hobbs had several conferences with employees of the contractor in charge of manufacturing valves for the project, the Crane Company. Sometime during

---

* Sam E. Whitaker of the Court of Claims sitting by designation. Judge Whitaker died March 26, 1967. He, therefore, did not participate in the decision of this case.

1. In the Matter of the Application of James C. Hobbs, 1963, 1 CCH Atomic Energy L.Rep. ¶4579.

a three-day conference with the Crane Company in early November 1943 Hobbs conceived of a new sort of gate valve, which he suggested as a solution to the problem. Hobbs and the employees of Crane made several modifications in the original design, and Crane built working models of Hobbs's conception. Eventually, Crane put the final design into production. The Atomic Energy Commission has used the valves extensively, both at Oak Ridge and at its other facilities for the production of special nuclear material.

Hobbs also conceived of another valve, essential to the functioning of Oak Ridge, sometime in early May 1944. Like the gate, or "G" valve, this instrument, or "H" valve was developed in cooperation with employees of the Crane Company. The AEC used this valve extensively at all plants. In 1945 and 1946 Hobbs filed applications for patents for his two valves. The Patent Office issued patents in 1950 and 1952. In 1956 he filed with the AEC an application for just compensation under the Atomic Energy Act of 1946.

## I.

A. The Atomic Energy Act of 1946 drastically affected the property concepts surrounding patent law in the field of atomic energy.[2] Section 11(a) (1) provided:

No patent shall hereafter be granted for any invention or discovery which is useful solely in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon. Any patent granted for any such invention or discovery is hereby revoked,

and just compensation shall be made therefor. 60 Stat. 768.

Section 11(a) (2) provided:

No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon. Any rights conferred by any patent heretofore granted for any invention or discovery are hereby revoked to the extent that such invention or discovery is so used, and just compensation shall be made therefor. Ibid.

Section 11(d) provided:

The Commission is authorized to purchase, or to take, requisition, or condemn, and make just compensation for, (1) any invention or discovery which is useful in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon, or which utilizes or is essential in the utilization of fissionable material or atomic energy, or (2) any patent or patent application covering any such invention or discovery. 60 Stat. 769.

The Atomic Energy Act of 1954 replaced the Atomic Energy Act of 1946. That Act also regulates patent rights, but to a less severe degree. Section 151 of the act, 42 U.S.C. § 2181, denies and revokes patent rights only for inventions useful "in the utilization of special nuclear material or atomic energy in atomic weapons." Section 160, 42 U.S.C. § 2190, permits the untimely application for patents barred by the 1946 Act. Both acts lodge the initial responsibility for

2. See Ooms, The Patent Provisions of the Atomic Energy Act, 15 U.Chi.L.Rev. 822, 825–26 (1948): "It was a departure from the general principles of property ownership and freedom of conduct without parallel in our history." See generally Newman & Miller, Patents and Atomic Energy, 12 Law & Contemp.Probs. 746 (1947); Miller, A Law is Passed—The Atomic Energy Act of 1946, 15 U.Chi.L. Rev. 799 (1948); Boskey, Inventions and the Atom, 32 Journal of the Patent Office Society 563 (1950); Valimont, Atomic Energy Patent Provisions and the American Economy, 31 J.P.O.S. 743 (1949); Boskey, Patents Under the New Atomic Energy Act, 36 J.P.O.S. 867 (1954); Note, Will the Patent Provisions of the Atomic Energy Act of 1954 Promote Progress or Stifle Invention?, 23 Geo. Wash.L.Rev. 195 (1954).

determining just compensation in the Patent Compensation Board of the AEC. Atomic Energy Act of 1946, § 11(e) (1), 60 Stat. 769; Atomic Energy Act of 1954, § 157(a), 42 U.S.C. § 2187(a). Both provide standards by which the Board is to determine the amount of compensation due. Atomic Energy Act of 1946, § 11(e) (3), 60 Stat. 770; Atomic Energy Act of 1954, § 157(c), 42 U.S.C. § 2187(c).

 Hobbs based his application for compensation on sections 11(a) (2), 11 (b), and 11(d) of the 1946 Act.[3] The Patent Compensation Board, after a hearing, dismissed his application.

The main thrust of the Board's opinion was that the United States had obtained shop rights in Hobbs's inventions. Since the government had an implied nonexclusive, royalty-free license to use the Hobbs valves, so the Board's theory goes, the AEC's use of them took nothing from Hobbs for which compensation must be paid.

These findings are not tailored to the requirements of the 1946 Act. The Act does not provide compensation for government infringement of patents. It totally obliterates patent rights in certain areas and provides that just compensation be paid for the obliteration. The Act does not specify that facts establishing a defense for the government against an infringement suit shall constitute a complete defense against an application for just compensation. Rather, it provides that infringement defenses should be one factor taken into account in determining the amount of just compensation for patent rights wiped out by the Act.

 The Act must be viewed as a whole. Section 11(a) (2) automatically terminates the inventor's rights in his invention to the extent that the invention is useful in the production of fissionable material. These terminated rights derive their value not only from potential royalties from the government, but from potential sale or licensing to private parties as well.[4] Thus even if the government owns an implied license in the invention, other valuable rights remain the property of the inventor. Section 11(a) (2) terminated these rights.

The Board ignored the existence of the rights which the inventor retains after the government license is subtracted. It found that to justify compensation, "the property taken must be clearly that to which the Government has no title," and that since the government had shop rights, nothing was taken. We hold that this statement of the law was erroneous. So long as the inventor held some rights, he is entitled to compensation for section 11(a) (2)'s termination, regardless of the existence of a license in the government.

 The existence of shop rights is not, of course, irrelevant to a proceeding for just compensation before the Board. Section 11(e) (3) provides:

(B) In determining what constitutes just compensation under subsection (a), (b), or (d) above, the Commission shall take into account the considerations set forth in paragraph (A) above, ["any defense, general or special, that might be pleaded by a defendant in an action for infringement, the extent to which, if any, such patent was developed through federally financed research, the degree of

---

3. Even though the substance of Hobbs's claim is to be determined under the 1946 Act, the case is properly here for review under the provisions of the 1954 Act. See N.V. Philips' Gloeilampenfabrieken v. Atomic Energy Commission, 1963, 114 U.S.App.D.C. 400, 316 F.2d 401; Anderson v. United States Atomic Energy Commission, 7 Cir. 1963, 313 F.2d 313.

4. Section 4(e) of the Act lodges exclusive control of the manufacturing of devices for the production of fissionable material in the Commission. Private parties may, however, be licensed to manufacture such facilities. Section 11(c) (2) requires that the licensee pay the patentee a reasonable royalty for the use of his invention. Thus while the value of the inventor's right to license private parties is not unlimited, a valuable right nonetheless exists.

utility, novelty, and importance of the invention, and \* \* \* (in its discretion) the cost to the owner of the patent of developing such invention or discovery or acquiring such patent."] and the actual use of such invention or discovery \* \* \*.

Certainly the Board's consideration of the shop rights defense was proper. Indeed it was mandatory under section 11 (e) (3). We disagree, however, that the doctrine requires a total denial of compensation in this case. If the government did have a shop right, the inventor would be unable to exploit his patent rights by selling or licensing his invention to the government. This inability might well deprive these rights of much of their value. But, as we have pointed out above, it does not render them absolutely valueless.

■ In the last page of its opinion the Board found that the valves in question "were developed completely through federally financed work, whether it be called 'research' or some other name". It added, "[W]e consider the cost to Applicant of the particular contributions he has made to his project as zero." The Board apparently felt that the existence of any of the factors listed in section 11(e) (3) would justify denial of compensation. We disagree. While section 11(e) (3) lists these factors as relevant to the amount of compensation due, we do not believe that their mere existence permits the denial of compensation altogether. In the other subsections of section 11, Congress provides that just compensation be paid for the revocation of any patent rights. Subsection (e) does not set forth those factors whose existence will bar compensation, but rather lists the criteria for determining the measure of that compensation. In other words, the operative fact is the taking of a patent right under section 11(a). Once that taking has been established, just compensation in some

amount is due. The factors listed in section 11(e) (3) govern the amount of compensation due. On remand, the Board should consider these criteria carefully in ascertaining the amount of compensation,[5] but it may not deny compensation entirely on their account.[6]

■■ This is not to say that section 11(e) (3) entirely supplants traditional defenses in every case, and that whenever a patent has been issued on an invention useful in the production of fissionable material, just compensation in some amount must be paid, regardless of any defense. Certainly when the government establishes a defense, such as unpatentability, which negatives the existence of any rights in the inventor, the defense would be a complete bar to compensation. The Act would have deprived the inventor of nothing of value.

■■ B. In this case, Hobbs did not own actual patents on his valves at the time the 1946 Act was passed, but had only applications for patents. Nonetheless, as the Eighth Circuit has observed, "The right of [the inventor] \* \* \* to his invention while his application is pending is an inchoate right, which matures as property when the patent issues, and it may have great prospective value." Mullins Mfg. Co. v. Booth, 1942, 125 F.2d 660, 664; cf. Opinion of the Comptroller General, January 8, 1963, 136 U.S.P.Q. 321. Patents on Hobbs's valves did in fact issue in 1950 and 1952, but the 1946 Act limited their scope, at least until the enactment of the 1954 Act, to uses other than the production of fissionable material.

II.

Because the Board.incorrectly applied the standards of section 11(e) (3), we must reverse its decision and remand the case for further consideration. Although this action disposes of the case before us, the question of the government's shop rights will undoubtedly arise

---

5. See generally, Newman & Miller, supra note 2, at 760–64.

6. Our rejection of the Board's interpretation of the Act does not imply that we accept Hobbs's theory of the measure of his damages. We do not.

again on remand. The Board treated the question extensively in the original proceedings and the parties fully briefed and argued it in this Court. In the interest of judicial economy,[7] therefore, we add our comments on this and other issues for the guidance of the Board.

A. We conclude that on the facts of this case the government did not obtain shop rights to Hobbs's valves. The classic shop rights doctrine ordains that when an employee makes and reduces to practice an invention on his employer's time, using his employer's tools and the services of other employees, the employer is the recipient of an implied, nonexclusive, royalty-free license. See, e. g., Gill v. United States, 1896, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480.

The Board refused to find as a fact that Hobbs and Kellex agreed that Hobbs was to retain all rights to his inventions: "[U]nder the special and unusual circumstances of this case, we have concluded that any express (oral) agreement which may have been entered into, was * * * later modified, not by spoken or written words, but by the actions of the parties * * *" Although it is by no means clear to what actions the Board referred, it seems probable that the Board meant Hobbs's permitting Kellex and the Government to make use of his valves without his making an express claim for compensation. It is undisputed, however, that throughout the period of his employment, and thereafter, Hobbs continually refused to waive his patent rights or to negotiate a royalty-free license. We think that these refusals were adequate to notify both Kellex and the government that Hobbs did not intend his employer to receive any rights in his inventions.

In Heywood-Wakefield Co. v. Small, 1 Cir. 1937, 87 F.2d 716, 720, the inventor disclosed to his employer a rough model of a new railroad car seat base, but declined to submit it as a "suggestion". The employer's lawyers convinced Small that the company had a shop right. Even though this led Small to admit the existence of shop rights, he added, "They are not going to get this for nothing." The court held these facts sufficient to negative the existence of shop rights. Hobbs was even more insistent that he not be denied his patent rights. There was little or nothing more he could have done to protect himself. See Beecroft & Blackman v. Rooney, S.D.N.Y.1920, 268 F. 545 (L. Hand, J.); Note, 30 Colum.L.Rev. 1172, 1173 (1930).

We do not imply that an inventor may unilaterally deprive his employer of shop rights. In this case, however, Hobbs's unilateral action does negative any intent to modify his original understanding with Kellex.

In any event, we do not think shop rights can arise in favor of the government in this case. The Board found as a fact that Hobbs "was not directly employed by, or a contractor of, the Government". Nonetheless · it held that since Hobbs developed the valves with the aid of a government contractor's staff and equipment (Crane Company), was on the payroll of another government contractor (Kellex Corporation), and conceived and developed the valves while working on a government project (Oak Ridge), shop rights in the United States arose. The Board's theory apparently was that Hobbs, Kellex, Crane, and all the other contractors and employees working on the Oak Ridge project were more or less fellow employees of the government, striving together to produce the bomb.

Such a relationship does not give rise to shop rights. Shop rights generally arise only where there is a direct employer-employee relationship. Neon Signal Devices, Inc. v. Alpha-Claude Neon Corp., W.D.Pa.1931, 54 F. 2d 793, 794; Crom v. Cement Gun Co., D.Del.1942, 46 F.Supp. 403; see Farrand Optical Co. v. United States, S.D.N.Y. 1959, 175 F.Supp. 230, 249, aff'd en

7. Hobbs filed his original claims with the Board more than ten years ago, in October 1956.

banc on another issue, 2 Cir. 1963, 317 F.2d 875; Note, 30 Colum.L.Rev. 1172 (1930). There is language is the cases indicating that the doctrine has a somewhat broader scope, but in none of these cases was the factual situation similar to that here. In the *Neon Signal Devices* case, supra, the court said that the doctrine "is not restricted alone to the case of an employer, as [it] * * * is only a phase of the broad doctrine of estoppel. * * * The doctrine is broad enough to include a case of the permissive use of a person other than an employer." 54 F.2d at 794. In that case, however, the shop right arose in a direct employee-employer situation and the question was whether a successor corporation not employing the inventor could assert the shop rights defense. In Gate-Way, Inc. v. Hillgren, S.D.Cal.1949, 82 F.Supp. 546, 554, the court ruled that a shop right could exist in the absence of an employer-employee relationship. The basis of the plaintiff's attack on the shop right is not clear. It urged either that a shop right could not arise in favor of a partnership when the inventor was a partner or, as in *Neon Signal*, that once the assets of the partnership had been sold to a corporation not employing the inventor shop rights could no longer exist. In either case, the facts were dissimilar to those in this case.

On the other hand, there is language in the cases holding that the employer-employee relationship is necessary to the implication of shop rights. On facts quite similar to those presented here, the court in Crom v. Cement Gun Co., D.Del.1942, 46 F.Supp. 403, found that shop rights did not arise. There the inventor had been an employee of the defendant, but had left the company to form a partnership firm of his own. The invention took place while the plaintiff was working on a project for which his firm had a contract with the defendant. The court concluded:

Under no circumstances can a shop right come into existence unless the inventor was an employee at the time when the invention was made and re-duced to practice. I find as a fact that Crom was not an employee of the defendant in 1927 when the invention was made. 46 F.Supp. at 404.

See also Farrand Optical Co. v. United States, S.D.N.Y.1959, 175 F.Supp. 230, 249, aff'd en banc on another issue, 2 Cir. 1963, 317 F.2d 875.

At least two considerations underlie the shop rights doctrine. First, it seems only fair that when an employee has used his employer's time and equipment to make an invention, the employer should be able to use the device without paying a royalty. Second, under the doctrine of estoppel if an employee encourages his employer to use an invention, and then stands by and allows him to construct and operate the new device without making any claim for compensation or royalties, it would not be equitable to allow the employee later to assert a claim for royalties or other compensation. See, e. g., Gill v. United States, supra.

Neither consideration controls this case. Part of the reasoning behind the first consideration is that the employer is in a position to reward the inventive employee through salary increases, promotions, bonuses and the like. See Bowes, Re "Compulsory Licensing of Patents and Atomic Energy", 43 Journal of the Patent Office Society 643, 647 (1961). Thus there is little need for a legally enforceable reward to the employee, at least with respect to the employer's use. In the case of a contractor's employee, however, the government is not in a position to grant such informal rewards.

The basic inequity of allowing an employee to develop his invention at the expense of his employer and then to refuse a royalty free license is not so harsh in the case of a contractor's employee. The Board emphasizes that both Kellex's and Crane's government contracts were on a cost plus basis, and that the government therefore furnished all facilities and equipment and paid all salaries connected with the project. While this is true, we think that employees of a contractor cannot be charged

with knowledge of the arrangement between their employer and the government. Here there was evidence that Hobbs knew Kellex was required to obtain patent waiver forms, but there was no showing that he was aware of the cost plus basis of the contract. Even if he was familiar with the details of the contract, we do not see why the form of the contract should affect the implication of shop rights.

The estoppel consideration also loses much of its significance when it is applied against the employee of a contractor. It may be fairly simple for an employee to inform his employer that he intends to retain all rights to his invention. The task would be more difficult, however, if the employee were required to work his way back through the chain of contractors and to inform the ultimate source of the project of his intention to retain his patent rights. So much, we think, is not required of a contractor's employee. In any event Hobbs repeatedly informed both his employer and the government that he would not give up his patent rights without compensation.

 The provisions of section 11(e)(3) of the 1946 Act reinforce our conclusion that the shop rights doctrine is not applicable here, for Congress foresaw and there provided for the situation presented in this case. One of the factors which the section directs the AEC to take into consideration when setting just compensation is "the extent to which, if any, such patent was developed through federally financed research. * * *" The directive was evidently an outgrowth of significant general feeling that all inventions resulting from the expenditure of taxpayers' dollars should belong to the people rather than to individual inventors or giant corporate government contractors. See 1 U. S. Department of Justice, Report of the Attorney General to the President, Investigation of Government Patent Practices and Policies 19, 56–62 (1947); Kreeger, The Control of

Patent Rights Resulting From Federal Research, 12 Law & Contemp. Probs. 714 (1947). See generally Gerber, Patents-Inventions by Federal Employees and Contractors—Disposition of Title and Rewards, 35 J.P.O.S. 426 (1953). Public patent ownership was especially appropriate, Congress felt, where an entire field as vast and important as atomic energy had been opened entirely with federal funds. See Newman & Miller, Patents and Atomic Energy, 12 Law & Contemp. Probs. 746, 761–62 (1947). This part of section 11(e)(3) was not concerned with relationships between the inventor and his employer or the government. Nor was it concerned with equities in the use of time, tools, and staff, or about notice giving or misleading silence. The crucial fact was whether federal funds financed the research in the course of which the invention was made. Considered against this background, it seems clear that the "federal research" provision of section 11(e)(3) was intended to apply to persons not directly employed by the government, whether hired to invent or not. This provision fits the facts of this case snugly. Unlike the shop rights doctrine, as applied through the "defenses" clause of section 11(e)(3), it was specifically tailored to bring within its provisions all inventions conceived in the course of federally financed research. It need not be stretched in order to apply here. We conclude that it, rather than the shop rights doctrine, should govern Hobbs's application for just compensation.

 B. The Board held that Hobbs's inventions "were developed completely through federally financed work, whether it be called 'research' or some other name." The statute uses the word "research", not the word "work" or any other word. To us, "research" implies more than work. It involves the notion of lengthy, complex technical investigation.[8] We conclude, therefore, that an invention developed in connection with a federal contract is not necessarily the

8. Webster's Second New International Dictionary defines "Research" as: "[C]riti-

cal and exhaustive investigation or experimentation * * *".

product of "federally financed research" as that term is used in the Act.

In this case, the invention of the two valves was not the product of an intensive investigation. Rather the idea came to Hobbs suddenly one night in a Chicago hotel room, and was reduced to practice quickly, without exhaustive experimentation, and at very little cost to the government. The Board should take these considerations into account when on remand it considers the "federally financed research" clause of section 11(a) (3).

C. We note that the Board declined to consider the question whether the statute of limitations barred Hobbs's claim. In passing we call the Board's attention to the rather liberal approach to this problem taken by the courts in Anderson v. United States Atomic Energy Commission, 7 Cir. 1963, 313 F.2d 313, and N. V. Philips' Gloeilampenfabrieken v. Atomic Energy Commission, D.C.Cir. 1963, 316 F.2d 401.

\* \* \*

The decision of the Atomic Energy Commission is reversed, and the case is remanded to the Patent Compensation Board for further proceedings consistent with this opinion.