**Max C. McELMURRY and White River Technologies, Inc., Plaintiffs–Appellants,**

v.

**ARKANSAS POWER & LIGHT COMPANY, Entergy Corporation and Middle South Utilities, Defendants–Appellees.**

No. 92–1246.

United States Court of Appeals, Federal Circuit.

June 16, 1993.

David A. Hodges, Little Rock, AR, argued, for plaintiffs-appellants.

Thomas F. Meeks, Friday, Eldredge & Clark, Little Rock, AR, argued, for defendants-appellees.

Before NIES, Chief Judge, RICH, and MAYER, Circuit Judges.

RICH, Circuit Judge.

Max C. McElmurry and White River Technologies, Inc. (WRT) appeal the February 10, 1992 Judgment of the U.S. District Court for the Eastern District of Arkansas, Northern Division, granting a motion for summary judgment filed by Arkansas Power & Light Company (AP & L) and Entergy Corporation.[1] The district court held that there were no relevant or material factual disputes precluding a finding that AP & L holds "shop rights" to certain subject matter claimed in U.S. Patent No. 4,527,714, titled "Pressure Responsive Hopper Level Detector System" (Bowman patent), and thus, as a matter of law, AP & L had not infringed any claim of the Bowman patent. For the reasons set forth below, we *affirm.*

## I.  *Standard of Review*

■ Because WRT's complaint alleged patent infringement, the jurisdiction of the district court was based at least in part on 28 U.S.C. § 1338(a) (1988). Accordingly, we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1) (1988).

Under the Federal Rules of Civil Procedure, a motion for summary judgment is properly granted only where

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). In reviewing the district court's grant of summary judgment, we must make an independent determination as to whether the standards of Rule 56(c) have been met. Reversal is required if the district court improperly determined any genuine issue of material fact or erred in holding that AP & L was entitled to judgment as a matter of law. *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed.Cir.1992).

## II.  *Genuine Issues of Material Fact*

■ In considering AP & L's motion for summary judgment, the district court was required to view the evidence in the light most favorable to WRT and to draw all reasonable factual inferences in WRT's favor. AP & L had the burden of demonstrating the absence of any genuine issue of material fact. However, since AP & L supported its motion with three affidavits, deposition testimony, and a Rule 29 Statement of Uncontested Facts based upon these affidavits and testimony, the burden shifted to WRT to come forward with evidence directed to specific facts showing that there was a genuine issue for trial. *Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1141, 229 USPQ 182, 186 (Fed.Cir. 1986), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988); Fed.R.Civ.P. 56(e).

■ WRT failed to come forward with such evidence, instead choosing to rely upon conclusory statements and denials in its pleadings.[2] Mere denials and conclusory statements, however, are not sufficient to establish a genuine issue of material fact. *Hodosh,* 786 F.2d at 1141, 229 USPQ at 186; Fed.R.Civ.P. 56(e). Therefore, we find no error in the district court's holding that there were no genuine issues of material fact necessitating trial or in the district court's acceptance of the facts presented by AP & L in its supporting evidence for purposes of analyzing the "shop rights" issue.

## III.  *Shop Rights*

### A.  *Background*

AP & L hired Harold L. Bowman, the patentee, as a consultant on October 24, 1980, to assist in the installation, maintenance and operation of electrostatic precipitators at AP & L's White Bluff Steam Electric Station (White Bluff) located near Redfield, Arkansas. An electronic precipitator is a device

---

1. Unless the context indicates otherwise, "WRT" refers jointly to Mr. McElmurry and White River Technologies, Inc., and "AP & L" refers jointly to Arkansas Power & Light Company and Entergy Corporation.

2. For example, WRT denied several of AP & L's uncontested facts and admissions requests and declined to answer several of AP & L's interrogatories merely on the basis that WRT lacked knowledge as to the information at issue.

which removes granular ash particles (fly ash) from the gasses emitted by coal-fired boilers used to generate steam. As fly ash is removed, it is collected in hoppers referred to as precipitator hoppers. Prior to April of 1982, the precipitator hoppers at White Bluff employed a level detector system using a nuclear power source (K-ray system) to detect the level of fly ash in the hoppers.

AP & L was not satisfied with the K-ray system. As a result, in the early part of 1982, Bowman discussed with a Mr. Richard L. Roberts, an AP & L employee, replacing the K-ray system with a new level detector, an initial design of which they drew on a napkin.[3] In the proposed level detector, a vacuum gauge was connected to a pipe inserted and welded into the wall of a precipitator hopper. If the level of the fly ash collected in the hopper extended above the point where the pipe was inserted into the hopper, the vacuum gauge would no longer indicate that a vacuum existed, as it would if the level of the fly ash were below that point. Thus, by monitoring the vacuum gauge, one could determine whether the fly ash exceeded a certain level in the hopper.

AP & L considered the proposed level detector and, during a power outage in March of 1982, ordered its installation on one hopper at White Bluff for testing purposes. When it proved successful, AP & L ordered that the level detector be installed on a total of sixteen (16) precipitator hoppers at White Bluff. In each case, level detectors were installed both near the bottom and top of the hopper, thus allowing for the detection of the fly ash at two different levels in the hopper. When this system proved successful, AP & L ordered that the level detectors be installed on the remaining one hundred and twelve (112) precipitator hoppers at White Bluff. All costs associated with the installation and testing of the level detector on the one hundred and twenty eight (128) hoppers at White Bluff, including materials and working drawings, were paid by AP & L.

On October 24, 1982, Bowman moved from White Bluff to AP & L's Independence Steam Electric Station (ISES) located near Newark, Arkansas, to assist in the start-up, maintenance and operation of electronic precipitators at that facility. In November of 1982, Bowman formed White Rivers Technology, Inc. with McElmurry and a Mr. Johnny Mitchum, to market certain inventions on which Bowman held patents or was planning to seek patent protection. Bowman filed a patent application on the level detector on February 18, 1983, and the patent-in-suit issued on July 9, 1985. At some point prior to its issuance, Bowman assigned his patent rights to WRT.

While at ISES, Bowman assisted another AP & L engineer, a Mr. Will Morgan, in installing the level detector on precipitator hoppers at that facility. AP & L requested bids for the project and ultimately contracted with WRT to install the level detector on sixty four (64) of the hoppers at that location. An outside contractor other than WRT installed the level detector on the remaining sixty four (64) hoppers. AP & L did contract with WRT, however, to install certain electronic components of the level detectors installed by the outside contractor. The level detectors had been installed and were in operation on all one hundred and twenty eight (128) precipitator hoppers[4] by the end of 1984, prior to the issuance of the Bowman patent. Bowman's contract with ISES ended, however, in October of 1983 before completion of the project. All costs associated with the installation and testing of the level detectors at ISES, including materials and working drawings, were paid by AP & L even though some of the work was contracted out.

In 1985, based upon the success of the level detector on the precipitator hoppers at White Bluff and ISES, another AP & L

---

**3.** The district court noted in note 2 of its opinion that, although there was some question as to whether Bowman was the sole inventor of the level detector, the court would adopt WRT's claim that he was the sole inventor for purposes of deciding AP & L's motion for summary judgment.

**4.** As at White Bluff, the level detector was installed on each hopper both near the bottom and the top of the hopper. Unlike White Bluff, however, the gauges on the level detectors at ISES were connected to a light signalling device and a computer located in the precipitator control room, thus allowing for remote detection of the fly ash level in the hoppers.

engineer, a Mr. John Harvey, implemented a plan to install the level detector on fourteen (14) hydroveyer hoppers [5] at ISES.[6] Harvey informed Bowman of the plan to install the level detector on the hydroveyer hoppers, and Bowman indicated that he thought it was a good idea. Bowman also indicated that WRT would be interested in bidding on the project. AP & L ultimately awarded the contract, however, to another contractor because WRT was not the low bidder. In soliciting bids on the hydroveyer project, AP & L provided the contractors with specifications prepared by AP & L showing the work to be performed. The installation of the level detectors on the hydroveyor hoppers at ISES was completed in 1985, and all costs associated with their installation were paid by AP & L.

### B. District Court Litigation

On April 25, 1990, WRT brought suit against AP & L for patent infringement based on AP & L's solicitation of and contracting with a party other than WRT to install Bowman's patented level detector on the hydroveyer hoppers at ISES. The district court granted summary judgment in favor of AP & L on the basis that AP & L had acquired a "shop right" in the level detector claimed in the Bowman patent. AP

& L argued and the court agreed that, as a matter of law, Bowman's development of the patented level detector at AP & L's facilities at AP & L's expense entitled AP & L, under the "shop rights" rule, to reproduce and use the level detector in its business.[7] WRT then appealed to this court.

### C. Analysis

■ A "shop right" is generally accepted as being a right that is created at common law,[8] when the circumstances demand it, under principles of equity and fairness, entitling an employer to use without charge an invention patented by one or more of its employees without liability for infringement. *See generally* D. Chisum, *Patents*, § 22.02[3] (1985 rev.); C.T. Dreschler, Annotation, *Application and Effect of "Shop Right Rule" or License Giving Employer Limited Rights in Employee's Inventions and Discoveries*, 61 A.L.R.2d 356 (1958); P. Rosenberg, *Patent Law Fundamentals*, § 11.04, 11–20 (1991). However, as recognized by several commentators, *supra*, the immense body of case law addressing the issue of "shop rights" suggests that not all courts agree as to the doctrinal basis for "shop rights," and, consequently, not all courts agree as to the partic-

---

5. The function of a hydroveyer hopper is essentially the same as that of a precipitator hopper, i.e., to collect ash. They differ in that a precipitator hopper collects small particles of ash extracted by an electrostatic precipitator, whereas a hydroveyer hopper collects larger particles of ash in and around a device known as an economizer. They also are shaped differently and are located at different places in the plant.

6. On these hoppers, the level detector was installed near the middle of each hopper, and the detector was connected to a remote light signalling device.

7. The court never analyzed the claims of the Bowman patent relative to the alleged infringing activity or relative to any "shop right" that AP & L possessed. Rather, the court stated that it would view the facts in the light most favorable to WRT and accept, for purposes of AP & L's summary judgment motion, that the alleged infringing devices were identical to those claimed in the Bowman patent and previously installed at AP & L's facilities.

8. Although a creature of common law, most courts rely upon the leading Supreme Court decisions *McClurg v. Kingsland*, 42 U.S. (1 How.) 202, 11 L.Ed. 102 (1843), *Gill v. United States*, 160 U.S. 426 (1896), and *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933), to analyze "shop rights" issues, even though these decisions were rendered prior to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See Wommack v. Durham Pecan Co.*, 715 F.2d 962, 219 USPQ 1153 (5th Cir.1983); *Mechmetals Corp. v. Telex Computer Prods., Inc.*, 709 F.2d 1287, 219 USPQ 20 (9th Cir.1983); *Hobbs v. United States*, 376 F.2d 488, 153 USPQ 378 (5th Cir.1967); *Wiles v. Union Wire Rope Corp.*, 134 F.Supp. 299, 107 USPQ 266 (W.D.Mo.1955), *appeal dismissed*, 257 F.2d 813 (8th Cir.1958); *Thompson v. American Tobacco Co.*, 174 F.2d 773, 81 USPQ 323 (4th Cir.1949); *Ingersoll–Rand Co. v. Ciavatta*, 110 N.J. 609, 542 A.2d 879, 8 USPQ2d 1537 (N.J.1988); *Cambridge Wire Cloth Co. v. Applegarth*, 142 USPQ 514, 1964 WL 8101 (Md.Cir. Ct.1964); *Aero Bolt & Screw Co. v. Iaia*, 180 Cal.App.2d 728, 5 Cal.Rptr. 53, 125 USPQ 545 (1960); *Cahill v. Regan*, 5 N.Y.2d 292, 157 N.E.2d 505, 184 N.Y.S.2d 348, 121 USPQ 58

ular set of circumstances necessary to create a "shop right."

For example, many courts characterize a "shop right" as being a type of implied license,[9] and thus the focus is often on whether the employee engaged in any activities, e.g., developing the invention on the employer's time at the employer's expense, which demand a finding that he impliedly granted a license to his employer to use the invention. Other courts characterize a "shop right" as a form of equitable estoppel,[10] and thus the focus is often on whether the employee's actions, e.g., consent or acquiescence to his employer's use of the invention, demand a finding that he is estopped from asserting a patent right against his employer. Neither characterization appears to be inherently better than the other, and the end result under either is often the same, given that the underlying analysis in each case is driven by principles of equity and fairness, and given that the courts often analyze a "shop right" as being a combination of the two even though they may characterize it in name as one or the other.[11]

It is thus not surprising that many courts adopt neither characterization specifically, instead choosing to characterize a "shop right" more broadly as simply being a common law "right" that inures to an employer when the circumstances demand it under principles of equity and fairness.[12] These courts often look to both the circumstances surrounding the development of the invention and the facts regarding the employee's activities respecting that invention, once developed, to determine whether it would be fair and equitable to allow an employee to preclude his employer from making use of that invention. This is essentially the analysis that most courts undertake regardless of how they characterize "shop rights."

In view of the foregoing, we believe that the proper methodology for determining whether an employer has acquired a "shop right" in a patented invention is to look to the totality of the circumstances on a case by

---

(1959). Accordingly, the principles set out in this opinion govern "shop rights" analyses.

9. *See McClurg v. Kingsland*, 42 U.S. (1 How.) 202, 11 L.Ed. 102; *Solomons v. United States*, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; *Mechmetals*, 709 F.2d 1287, 219 USPQ 20; *Hobbs*, 376 F.2d 488, 153 USPQ 378; *Wiles*, 134 F.Supp. 299, 107 USPQ 266; *Ingersoll–Rand*, 110 N.J. 609, 542 A.2d 879, 8 USPQ2d 1537. *See also* W.C. Robinson, *Law of Patents for Useful Inventions*, § 832 (1890); L.H. Amdur, *Patent Law and Practice*, § 12 (1935); R.C. Witte and E.W. Guttag, *Employee Inventions*, 71 JPTOS 470–71 (1989); T.R. Savitsky, *Compensation for Employee Inventions*, 73 JPTOS 647–48 (1991).

10. In *Gill*, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480, an influential estoppel case, the Supreme Court stated in pertinent part at pages 436–37, 16 S.Ct. at page 326:

> if the inventions of a patentee be made in the course of his employment, and he knowingly assents to the use of such inventions by his employer, he cannot claim compensation therefor, especially if his experiments have been conducted or his machines have been made at the expense of such employer.
> ....
> The acquiescence of the [inventor] in this case in the use of his invention by the [employer] is fully shown by the fact that he was in its employ; that the adoption of his inventions by the [employer] was procured at his suggestion; that the patterns and working drawings were prepared at the cost of the [employer]; that the machines embodying his inventions were also

> built at the expense of the [employer]; that he never brought his inventions before any agent of the [employer] as the subject of purchase and sale; that he raised no objection to the use of his inventions by the [employer]; and that the [employer] never undertook to incur a legal or pecuniary obligation on the part of the [employer] for the use of the inventions or the right to manufacture thereunder.

*See also Dovel v. Sloss–Sheffield Steel & Iron Co.*, 139 F.2d 36, 60 USPQ 86 (5th Cir.1943), cert. denied, 322 U.S. 740, 64 S.Ct. 1057, 88 L.Ed. 1573 (1944); *Beecroft & Blackman, Inc. v. Rooney*, 268 F. 545 (S.D.N.Y.1920), rev'd on other grounds, 280 F. 543, 549 (2d Cir.1922) (Judge Learned Hand: "The rule is entirely equitable: the books put in the form of an estoppel.").

11. Some courts even characterize a "shop right" as being a combination of an implied license and equitable estoppel. *See Kierulff v. Metropolitan Stevedore Co.*, 315 F.2d 839, 137 USPQ 195 (9th Cir.1963).

12. *See Dubilier*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114; *Francklyn v. Guilford Packing Co.*, 695 F.2d 1158, 217 USPQ 317 (9th Cir.1983); *Consolidated Vultee Aircraft Corp. v. Maurice A. Garbell, Inc.*, 204 F.2d 946, 98 USPQ 4 (9th Cir.), cert. denied, 346 U.S. 873, 74 S.Ct. 122, 98 L.Ed. 381 (1953); *Thompson*, 174 F.2d 773, 81 USPQ 323; *Logus Mfg. Corp. v. Nelson*, 195 USPQ 566, 1977 WL 22721, 200 USPQ 570, 1977 WL 23188 (E.D.N.Y.1977); *Papazian v. American Steel & Wire Co.*, 155 F.Supp. 111, 115 USPQ 333 (N.D.Ohio 1957); *Cambridge Wire*, 142 USPQ 514; *Aero Bolt*, 180 Cal.App.2d 728, 5 Cal.Rptr. 53, 125 USPQ 545; *Cahill v. Regan*, 5 N.Y.2d

case basis and determine whether the facts of a particular case demand, under principles of equity and fairness, a finding that a "shop right" exists. In such an analysis, one should look to such factors as the circumstances surrounding the development of the patented invention and the inventor's activities respecting that invention, once developed, to determine whether equity and fairness demand that the employer be allowed to use that invention in his business. A factually driven analysis such as this ensures that the principles of equity and fairness underlying the "shop rights" rule are considered. Because this is exactly the type of analysis that the district court used to reach its decision, we see no error in the district court's analysis justifying reversal.

To reach its decision, the district court looked to the discussion of "shop rights" set forth in the often-cited *Dubilier* case, in which the Court said:

> where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. [citation omitted] This is an application of equitable principles. Since the servant uses his master's time, facilities and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business.

*Dubilier*, 289 U.S. at 188–89, 53 S.Ct. at 558. The district court also accepted a discussion of "shop rights" set forth in one of WRT's briefs filed in the district court action as correctly summarizing several factors that

may be considered in analyzing a "shop rights" case.[13] At pages 9–10 of its opinion, the district court included the following excerpt from pages 6–8 of WRT's Memorandum Brief in Support of Response to Motion for Summary Judgment:

> Because broad equitable principles are involved in determining whether shop rights in [an] invention arise, "[t]he full nature of the parties' relationship must be examined to determine whether a shop right exists." Rosenberg, *Patent Law Fundamentals*, § 11.04, 11–20 (1991). The following factors have been considered: the contractual nature of the relationship between employer and employee, whether the employee consented to the employer's use of the invention, and whether the employee induced, acquiesced in, or assisted the employer in the use of the invention.... [footnote omitted]

> An employer will have shop rights in an invention in situations where the employer has financed an employee's invention by providing wages, materials, tools and a work place. Other factors creating shop rights include an employee's consent, acquiescence, inducement, or assistance to the employer in using the invention without demanding compensation or other notice of restriction. See Rosenberg, *Patent Law Fundamentals* § 11.04 (1991).

■ Applying *Dubilier* and the summary of the law set forth in WRT's own brief to the facts of this case, the district court properly found that AP & L had acquired a "shop right" in Bowman's patented level detector which entitled AP & L to duplicate the level detector for use in its business.

Bowman developed[14] the patented level

292, 157 N.E.2d 505, 184 N.Y.S.2d 348, 121 USPQ 58.

13. The summary of the law set forth by WRT adequately depicts the types of factors that courts often look to in analyzing "shop rights" issues. *See generally* cases cited *supra* in notes 9–12.

14. The district court noted at pages 4–5 of its opinion that, although it was unclear as to whether Bowman had pondered the idea of the level detector prior to his employment with AP & L, there was no evidence "that Bowman had ever

taken the idea beyond the concept stage before 1982 by producing working drawings, building a prototype of the level detector, testing it, or using it in a similar application at another facility." We agree with the district court's suggestion that whether Bowman conceived the invention prior to his employment with AP & L does not affect the ultimate conclusion in this particular case. *See Logus*, 195 USPQ 566, 200 USPQ 570 (shop right created where employee conceived invention prior to employment but then perfected and reduced to practice invention at employer's facilities, on employer's time, and with the use of employer's employees and materials).

detector while working at AP & L [15] and suggested it to AP & L as an alternative to the K-ray system. AP & L installed the level detector on one hundred and twenty eight (128) precipitator hoppers at White Bluff with Bowman's consent and participation. Bowman also consented to, and participated at least in part in, the installation of the level detector on one hundred and twenty eight (128) precipitator hoppers at ISES. In addition, the level detectors on half of the hoppers at ISES were installed by a contractor other than WRT, with Bowman's and WRT's knowledge and consent. All costs and expenses associated with the testing and implementation of the level detector on the hoppers at White Bluff and ISES were paid by AP & L.

Furthermore, Bowman never asserted that AP & L was precluded from using the level detector without his permission or that AP & L was required to compensate him for its use. Indeed, the record suggests that Bowman believed quite the opposite. As recognized by the district court at page 12 of its opinion,

> Bowman admitted in a deposition [footnote omitted] that he believed all along that AP & L would have shop rights. His patent attorney had informed him of that possibility and he subsequently shared the attorney's opinion with his partners in WRT. *See* Bowman deposition at 81–82.

■ WRT argues that Bowman's consent or acquiescence after he had assigned his rights in the Bowman application to WRT is irrelevant. Even if this were true, Bowman's actions at White Bluff prior to this assignment justify the district court's finding that a "shop right" was created. Nevertheless, WRT, of which Bowman was a part owner during the relevant time period, acquiesced both to AP & L's continued use of the level detector at White Bluff and ISES and to the installation of the level detector by outside contractors at ISES. This lends further support to the district court's decision.

■ WRT also argues that, even if AP & L had acquired a "shop right" to use the patented level detector, AP & L somehow exceeded the scope of that right when it allegedly "carelessly and casually disseminated the design and specifications of the patented device to private contractors." WRT argues that, by putting information of this nature on the open market, AP & L rendered the patent "worthless" and robbed Bowman of the "fruit of his labor." We find these arguments unpersuasive for two reasons.

First, WRT has failed to explain how AP & L's mere dissemination of specifications of the patented level detector constituted patent infringement. Clearly, it did not. The owner of a patent right may exclude others from making, using or selling the subject matter of a claimed invention. 35 U.S.C. §§ 154 and 271. AP & L's dissemination of information obviously does not fall into any of these categories. Even so, it is also unclear how disseminating specifications of the level detector after it was patented rendered the Bowman patent "worthless." The owner of the Bowman patent still retained the right to exclude all others than AP & L from practicing the claimed invention.

■ Second, we find no error in the district court's holding that AP & L's "shop right" entitled it to duplicate the level detector and to continue to use it in its business. Such a conclusion clearly finds support in the law. *H.F. Walliser & Co. v. F.W. Maurer & Sons Co.*, 17 F.2d 122, 124 (E.D.Pa.1927); *see also Dubilier*, 289 U.S. at 188–89, 53 S.Ct. at 558; *Thompson*, 174 F.2d at 778, 81 USPQ at 327–28; *Pure Oil Co. v. Hyman*, 95 F.2d 22, 25, 36 USPQ 306, 310 (7th Cir.1938) ("shop right is co-extensive with the business requirements of the employer"). Furthermore, AP & L's "shop right" was not limited to AP

---

**15.** WRT argues that Bowman's consultant contract with AP & L indicates that Bowman was an independent contractor and not an employee in the conventional sense. WRT asserts that the law is clear that Bowman must have been hired as an employee for a finding of "shop rights." WRT has failed, however, to provide any support for this assertion, and we find the law as supporting a contrary conclusion. *See Francklyn*, 695 F.2d at 1160–62, 217 USPQ at 319 (shop right is not necessarily limited to an employer-employee relationship); *Neon Signal Devices, Inc. v. Alpha–Claude Neon Corp.*, 54 F.2d 793, 794 (W.D.Pa.1931) (shop right rule broad enough to include permissive use by one other than an employer).

& L's use of level detectors that AP & L itself had manufactured and installed. Quite to the contrary, we find that AP & L's "shop right" entitled it to procure the level detector from outside contractors. *Schmidt v. Central Foundry Co.,* 218 F. 466, 470 (D.N.J. 1914), *aff'd on other grounds,* 229 F. 157 (3d Cir.1916).

Finally, WRT makes several arguments addressing the laws pertaining to the assignment of patent rights. However, AP & L has never asserted that it has any ownership rights in the Bowman patent. Rather, AP & L has merely claimed "shop rights" as a defense to WRT's patent infringement action. Accordingly, WRT's assignment arguments are considered irrelevant and thus unpersuasive.

*AFFIRMED.*